# SKAKEL DECLARATION
# EXHIBIT A

**Sworn translation from Dutch to English of:**

**Writ of summons of 19 March 2012 served at the request of OKEAN B.V. and LOGISTIC SOLUTION INTERNATIONAL LIMITED against OLYMPUS INVESTMENTS (2001) B.V. and five others**

Leiden, 20 March 2012

Translator's statement:

The undersigned, A.J.B. Burrough, registered as sworn translator for the English language at the District Court of The Hague and registered in the Dutch Register of Sworn Interpreters and Translators (RBTV) under no. 1963, hereby faithfully declares that the attached English translation is a faithful representation of the Dutch original, also attached.

A.J.B. Burrough MA

Sworn Translator English



Attached:

1) English translation of Writ of Summons dated 19 March 2012 (20 pages)
2) Dutch language original of the same (20 pages)

1

[Translation from Dutch]

Today, the nineteenth of March two thousand and twelve,

I have served this writ of summons

at the request of

I.  the private company with limited liability **OKEAN B.V.** ("Okean"), with registered seat in Gorinchem.

II. the company under foreign law **LOGISTIC SOLUTION INTERNATIONAL LIMITED** ("Logistic"), with registered seat in Road Town, Tortola, British Virgin Islands.

Okean and Logistic are electing as address for service in these proceedings (1077 XV) Amsterdam at Strawinskylaan 1999, at the offices of NautaDutilh N.V., advocaten, notarissen en belastingadviseurs, where the matter is being handled by R.J. van Galen, who Okean and Logistic have instructed as counsel.

This writ of summons is intended for:

I.  the private company with limited liability **OLYMPUS INVESTMENTS (2001) B.V.** ("Olympus"), with registered seat in Amsterdam and with offices in (6222 PH) Maastricht at the address Kruisdonk 66.

To this end I served my writ at the aforementioned address, leaving a copy thereof with:

to whom a copy in a separate writ is or will be served.



II. the company under foreign law **POIZANTER HOLDINGS LIMITED** ("Poizanter"), with registered seat, at any rate, with offices in (P.C. 3095) Limassol, Cyprus, at the address Kimonos 43A, without known place of establishment or office address in the Netherlands.

To this end, pursuant to Section 56 of the Dutch Code of Civil Procedure and in my capacity as transmitting agency as meant in EC Regulation no 1393/2007 of

2

the European Parliament and the Council of 13 November 2007 (EU Service Regulation) I have sent two copies hereof to the receiving agency in Cyprus, this being:

Υπουργείο Δικαιοσύνης και Δημοσίας Τάξεως
(Ministry of Justice and Public Order)
Λεωφόρος Αθαλάσσας (Athalassa Avenue 125)
1461 Λευκωσία Lefkosia (Nicosia)
Cyprus

This transmission occurred by <u>registered mail with confirmation of receipt</u> and was accompanied by:

- two Greek translations of this writ; and
- the form as meant in art. 4(3) of aforementioned EU Service Regulation, completed in English.

With which I requested the receiving agency to serve/give notice of this writ of summons to Poizanter in the manner as indicated at 5.1 in aforementioned form "request for the service of documents", this being in accordance with the law of the Member State addressed.

III.  the company under foreign law **FRADOMNA INVESTMENTS LIMITED** ("**Fradomna**"), with registered seat, at any rate, with offices in Nicosia, Cyprus, at the address Apostolu Varnava, 2, Centaur Haus Nicy 2571 without known establishment or office address in the Netherlands.



To this end, pursuant to Section 56 of the Dutch Code of Civil Procedure and in my capacity as transmitting agency as meant in EC Regulation no 1393/2007 of the European Parliament and the Council of 13 November 2007 (EU Service Regulation) I have sent two copies hereof to the receiving agency in Cyprus, this being:

Υπουργείο Δικαιοσύνης και Δημοσίας Τάξεως
(Ministry of Justice and Public Order)
Λεωφόρος Αθαλάσσας (Athalassa Avenue 125)
1461 Λευκωσία Lefkosia (Nicosia)
Cyprus

This transmission occurred by <u>registered mail with confirmation of receipt</u> and was accompanied by:

- two Greek translations of this writ; and

3

— the form as meant in art. 4(3) of aforementioned EU Service Regulation, completed in English.

With which I requested the receiving agency to serve/give notice of this writ of summons to Fradomna in the manner as indicated at 5.1 in aforementioned form "request for the service of documents", this being in accordance with the law of the Member State addressed.

IV. the company under foreign law **BLAKUR COMPANY INC.** ("**Blakur**"), with registered seat, at any rate, with offices in Road Town, Tortola, British Virgin Islands, at the address Pasea Estate, without known establishment or office address in the Netherlands.

To this end I served my writ at the offices of the Public Prosecutor at the District Court of Amsterdam and so there at Parnassusweg 220-222 Amsterdam left two copies hereof with:

to whom a copy in a separate writ is or will be served.

there employed,

to whom I also handed two English translations of this writ.

With this I requested that the writ and the accompanying English translation be served/given notice of to Blakur in accordance with articles 3 to 6 of the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters the Convention of 15 November 1965 (the "Convention"), <u>by service or notification with due observance of the formalities of the laws of the British Virgin Islands</u> as prescribed for the service or notification of documents drawn up in that country for persons located there, in both cases upon surrender of proof of receipt.



Additionally, a copy of this writ of summons and the accompanying English translation shall directly be sent by me <u>by courier with confirmation of receipt</u> to Blakur at its aforementioned address.

V. **JUDITH HAMBURGER** ("**Hamburger**"), resident at 8002, Zurich, Switzerland at the address Kappelistrasse 6, without known place of residence or abode in the Netherlands.

To this end I served my writ at the offices of the Public Prosecutor at the District Court of Amsterdam and so there at Parnassusweg 220-222 Amsterdam left two copies hereof with:

to whom a copy in a separate writ is or will be served.

4

there employed,

to whom I also handed two German translations of this writ.

With this I requested that the writ and the accompanying German translation be served/given notice of to Hamburger in accordance with articles 3 to 6 of the Convention <u>by service or notification with due observance of the formalities of the laws of Switzerland</u> as prescribed for the service or notification of documents drawn up in that country for persons located there, in both cases upon surrender of proof of receipt.

Additionally, a copy of this writ of summons and the accompanying English German shall directly be sent by me <u>by courier with confirmation of receipt</u> to Hamburger at her aforementioned address.

VI. the company under foreign law **PRIVATE JOINT STOCK COMPANY SMART-HOLDING** ("Smart-Holding"), with registered seat, at any rate, with offices in (04070) Kiev, Ukraine at the address Igorivska Street, 7-a without known establishment or office address in the Netherlands.

To this end I served my writ at the offices of the Public Prosecutor at the District Court of Amsterdam and so there at Parnassusweg 220-222 Amsterdam left two copies hereof with:

to whom a copy in a separate writ is or will be served.



there employed,

to whom I also handed two Ukrainian translations of this writ.

With this I requested that the writ and the accompanying Ukrainian translation be served/given notice of to Smart-Holding in accordance with articles 3 to 6 of the Convention, <u>by service or notification with due observance of the formalities of the laws of the Ukraine</u> as prescribed for the service or notification of documents drawn up in that country for persons located there, in both cases upon surrender of proof of receipt.

Additionally, a copy of this writ of summons and the accompanying English translation shall directly be sent by me <u>by courier with confirmation of receipt</u> to Smart-Holding at its aforementioned address.

5

**Cause-list date**

Defendants are hereby summoned to appear on Wednesday twenty-six September two thousand and twelve, not in person but represented by counsel, in the proceedings initiated by this summons, to be conducted at the District Court of Amsterdam, single judge division of the civil section (commercial cases team), at Parnassusweg 220 in Amsterdam in order to respond to the claim put forward in this writ of summons and the grounds thereof.

**With this I gave notice of the following:**

a. That, if a defendant fails to appoint counsel or fails to timely pay the court fee as mentioned below, and the prescribed deadlines and formalities have been observed, the court will grant leave to proceed in default of the non-appearance of this defendant and shall award the claim as described below, unless the court deems it unlawful or without basis.

b. If at least one of the defendants appoints counsel and has timely paid the court fee, a single judgment will be rendered among all parties, which shall be considered to be a judgment in a defended action.

c. Upon appearing in the proceedings Olympus, Fradomna, Poizanter, Blakur and Smart-Holding shall be each charged a court registry fee of EUR 575.00 and Hamburger shall be charged a court registry fee of EUR 267.00.

d. That a person of limited means shall be charged a lower court registry fee, this being EUR 73.00, if at the time at which the court registry fee is charged he has submitted:



1. a copy of the decision to grant legal assistance, as meant in Section 29 of the Dutch Legal Aid Act [*Wet op de Rechtsbijstand*], or if this is not possible due to circumstances that cannot be reasonably attributed to him, a copy of the application as meant in Section 24 (2) of the Legal Aid Act or
2. a statement by the Legal Aid Council as meant in Section 1(b) of aforementioned Act, demonstrating that his income does not exceed the amounts referred to in Section 35, (3) (a) to (d) and (4) (a) to (d) or in those paragraphs in subsections, in part e of said Act; on the understanding that as a consequence of an amendment to the Legal Aid Act that has now come in to force,

6

the statement is now issued by the board of the Legal Aid Council, as meant in Section 3 of said Act, while the amounts used for testing the income are stated in Section 4(1) and (2) of the Legal Aid Personal Contribution Decree [*Besluit eigen bijdrage rechtsbijstand*].

e. Defendants appearing by the same counsel and submitting identical statements shall, on the basis of Section 15 of the Act on Court Fees in Civil Cases [*Wet griffierechten burgerlijke zaken*], only be charged a single fee.



7

**Grounds of the claim**

*Introduction*

1. Prior to 6 October 2010, the Norwegian company Wadan Yards Group AS ("**Wadan Yards AS**") held all shares in Okean. Wadan Yards AS was declared bankrupt on 16 March 2010 by the District Court of Oslo. Johan Ratvik of DLA Piper Norway DA was appointed as the receiver. On 6 October 2010 the receiver of Wadan Yards AS subsequently transferred the shares in Okean to Link Business Solutions Limited ("**Link**").

2. On 7 March 2012 the receiver of Wadan Yards AS transferred to Logistic the rights resulting from the various credit agreements between Wadan Yards AS and Okean, which among other things enabled Okean to provide financing to Wadan Yards, together with all the rights related to the fraudulent conveyance and unlawful acts by defendants and others as described below (**exhibit 1**). Link and Logistic have the same ultimate beneficial owner. In the context of these loan agreements, Logistic holds a claim of EUR 53,320,735, excluding interest, against Okean.

3. Okean, in turn, held 98.74% of the shares in the Ukrainian company Wadan Yards Okean Open Joint Stock Company ("**Wadan Yards**"). Wadan Yards' main asset is a shipping yard in Ukraine.

4. On 26 February 2010, just a few weeks before the bankruptcy of its sole shareholder Wadan Yards AS, Okean, under a Share Sale and Purchase Agreement, sold and transferred its shares in Wadan Yards (the "**Shares**") to Blakur for the purchase price of EUR 5,000,000 (the "**Purchase Price**") (**exhibit 2**, the "**SPA**"). Blakur had been incorporated a few weeks before this on 21 January 2010. As will be discussed below, the SPA provided that Blakur only had to pay the Purchase Price at a later stage and no surety for payment of the Purchase Price was obtained. Blakur still has yet to pay the Purchase Price. In all likelihood, Blakur then transferred the Shares to Trade House AELITA Limited ("**AELITA**"). AELITA then transferred on the Shares to five companies, which ultimately then transferred the Shares to Olympus. It may be so that Olympus very recently transferred 50% of the Shares to Smart-Holding. Insofar as the details of these transactions are known, they are set forth in nos. 21 et seq.



8

5. On 2 March 2010, Okean then also transferred its two claims against Wadan Yards to Blakur, each for the symbolic purchase price of USD 100. The claims result from two loan agreements and appear from, inter alia, the "*Term Loan Facility Agreement No. 4*" (**exhibit 3**) and the "*Term Loan Facility Agreement No. 5*" (**exhibit 4**, hereinafter jointly referred to as the "**Loans**"). On 14 May 2010, Blakur also transferred these claims to third parties, i.e. Poizanter and Fradomna, see nos. 13 through 18.

6. On 16 March 2010 Wadan Yards AS went bankrupt.

7. Blakur was dissolved voluntarily on 30 March 2011 at the request of its sole director Hamburger (**exhibit 5**). However, after Link had replaced the management of Okean in its capacity of shareholder of Okean, Okean applied to the court in the British Virgin Islands seeking to have the dissolution of Blakur reversed and to pronounce Blakur bankrupt. In this way Russell Crumpler of KPMG was appointed as receiver on 28 November 2011.

8. The SPA was signed for Blakur by Hamburger and for Okean by PJSC ING Bank Ukraine, acting on the basis of a power of attorney set down in an Agency Agreement of 9 February 2010 (**exhibit 6**). The Agency Agreement was also signed by the director of Okean, Igor Shaposhnikov ("**Shaposhnikov**"). In the deeds of assignment of 2 March 2010, Okean was represented by its director Igor Shaposhnikov and Blakur once again by Hamburger. Additionally, the assignments were signed by Mykola Pavlovych Romanchuk ("**Romanchuk**") on behalf of Wadan Yards, in view of the required permission of Wadan Yards to transfer the rights under the Loans to third parties.

9. At the time of the aforementioned transactions, Shaposhnikov was also chairman of the Supervisory Board ("**SB**") at Wadan Yards. The minutes of the meeting of the SB of 11 May 2010 show that Shaposhnikov, in his capacity of Chairman of the SB, tabled the resolution in the SB to authorise the General Manager of Wadan Yards, Romanchuk, to approve the transfer of the Loans of Blakur to Poizanter and Fradomna (**exhibit 7**).

10. So, at the time of these transactions, Shaposhnikov was a director at Okean and Chairman of the Supervisory Board at Wadan Yards. Shaposhnikov, in cooperation with Hamburger and Blakur extracted the most important assets from Okean. This can only lead to the conclusion

9

that Shaposhnikov, as director of Okean, in cooperation with Hamburger and Blakur, acted unlawfully vis-à-vis Okean. Moreover, in this way, the debtor and also the most important possession of Wadan Yards AS was drained to the detriment of Wadan Yards AS and its creditors.

11. The aforementioned transactions have prejudiced the creditors of Okean (including Wadan Yards AS) and have prejudiced Wadan Yards AS. The receiver of Wadan Yards AS came to the same conclusion in a letter of 13 December 2010 (**exhibit 8**):

*"It is the assessment of the bankruptcy administration that the transfer of shares to Blakur Company Inc. is an illegal transaction that is voidable and should be revoked"*

Further on in the letter, the receiver notes that:

*"The bankruptcy administration is of the opinion that the transfer of debt is an illegal transaction, being part of a scheme to evade major values/assets from the bankruptcy estate."*

*Interlude: Ukrainian commencement proceedings*

12. In the period between March and June 2011 Okean made various attempts to initiate litigation in the Ukraine against Blakur, Poizanter and Fradomna with respect to the Loans. Under Ukrainian law a claimant, before being allowed to serve the writ of summons, must obtain the court's permission to bring his claim. The court then assesses the documents for procedural requirements, such as having satisfied the (correct amount) in court fees. Okean's requests were all dismissed on the basis of its failure to meet these procedural requirements, as a result of which it was unable to bring any claims in the Ukraine.



*The loan agreements of 8 August 2005 and 15 June 2007*

13. Under a *Term Loan Facility Agreement No. 4* of 8 August 2005 Okean made available to Wadan Yards a loan of USD 2,030,000 (exhibit 3, **"Term Loan No. 4"**).

14. Under a *Term Loan Facility Agreement No. 5* of 14 June 2007, also between Okean and Wadan Yards (exhibit 4, **"Term Loan No. 5"**), Okean made available to Wadan Yards a loan of EUR 25,000,000. This

loan agreement was amended by additional agreements, the "*Additional Agreement No. 1*" of 10 June 2008 (**exhibit 9**) meaning a total loan amount of EUR 45,000,000 was ultimately made available to Okean and the "*Additional Agreement No. 2*" of 26 December 2008, in which the change of name of Wadan Yards is recorded (**exhibit 10**).

15. Wadan Yards made various draw-downs under the loans. The current amount outstanding under Term Loan No. 4 is EUR 2,029,784.44, excluding interest. Under Term Loan No. 5 a total of EUR 41,931,314 has been drawn down, excluding interest.

16. On 2 March 2010, under the "*Deed of Assignment and Amendment to Term Facility Loan Facility Agreement No. 4 and 5*" Okean transferred the Loans to Blakur where the following is considered (**exhibit 11 and 12**, p. 3):

    "*(B) the Borrower [Wadan Yards] is [in] need of financial assistance and the New Lender [Blakur] is prepared to provide the Borrower with the required financing for the facilitation of the new orders on shipbuilding.*"

    As far as Okean and Logistic are aware, however, Blakur never provided additional financing to Wadan Yards.

17. Another important point from the financing documentation relates to the symbolic purchase price (exhibit 11 and 12, p. 5):

    

    "*2.1. (b) In consideration of the assignment of the Assigned Rights, the New Lender [Blakur] has paid to the Original Lender [Okean] USD 100 (One Hundred US dollars), and the Original Lender hereby acknowledges the receipt and confirms the sufficiency thereof.*"

    In this way Okean transferred all of its rights under the Loans to Blakur (see exhibit 11 and 12, p. 3 under (C)) for a total purchase price of USD 200.

18. On 14 May 2010, only two months later (and significantly three days after the meeting of the Supervisory Board of Wadan Yards to which reference is made at no. 10 above), Blakur, again entered into a "*Deed of Assignment and Amendment to Term Facility Loan Facility Agreement No. 4 and 5*" *to transfer* the Loans to two different parties. Term Loan

11

No. 4 was transferred to Fradomna (**exhibit 13**) and the Term Loan No. 5 was transferred to Poizanter (**exhibit 14**), both again for the symbolic purchase price of USD 100 each. The assignment deeds are virtually identical.

19. On 10 June 2010 various agreements for security were entered into by Wadan Yards and Poizanter. These concern the following three agreements:

    (i) Mortgage Agreement (**exhibit 15**)
    (ii) Pledge Agreement (**exhibit 16**)
    (iii) Rights to Operating Account Pledge Agreement (**exhibit 17**)

20. On 10 June 2010 Wadan Yards also issued rights of pledge on its properties to Fradomna as defined in the Pledge Agreement (**exhibit 18**). The minutes of the SB of 11 May 2010 as cited above (exhibit 7, see no. 10) show that security was provided to Poizanter and Fradomna in order for them to provide additional financing to Wadan Yards. However, Wadan Yards never received this additional financing, in all likelihood because there was never an intention on the part of any of Poizanter, Fradomna or the management of Wadan Yards that any such financing should be made available. By providing the abovementioned security, Poizanter and Fradomna de facto obtained security rights to all the assets of Wadan Yards.

*Transfer of the shares*



21. Pursuant to the SPA of 26 February 2010 between Okean and Blakur, Blakur acquired 137,102,938 registered shares in Wadan Yards, constituting 98.74% of the shares issued (exhibit 2). Under the SPA Blakur owes a Purchase Price of EUR 5,000,000 to Okean, which is to be paid in two instalments:

    *2.2. (b) The Purchase Price shall be paid in two instalments:*

    - *The first instalment, in the amount of EUR 400.000 (four hundred [thousand] Euro [...] shall be paid within 30 (thirty) days following the Completion Date to the account of the Seller [Okean][...].*

12

> - *The second instalment, in the amount of EUR 4.600.000 (four million six hundred [thousand] Euro) [...] shall be paid within 12 (twelve) months following the Completion Date to the account of the Seller [...].*

22. However, the SPA was amended on 9 March 2010 (**exhibit 19**):

> "4. The Parties hereunder have agreed to amend Clause 2.2 (b) of the SPA as follows:
>
> "(b) The Purchase Price will be paid by the Purchaser by its execution of a promissory note payable to the Seller for the amount of EUR 5.000.000 (five million Euro), said promissory note to be governed and enforceable under the laws of the British Virgin Islands and providing for payment in full to be made no later that 12 (twelve) months from the date of execution of the SPA. The promissory note will be issued by the Purchaser within 45 (forty five) days from the date of execution of the SPA.""

23. The promissory note was issued by Blakur and signed by Hamburger (**exhibit 20**), however, as has already been indicated above at no. 4, the Purchase Price has not been paid to date. Blakur does not have any assets of its own with which to pay the Purchase Price and it also never had such. Okean also never investigated whether Blakur would be able to finance the Purchase Price nor did it seek or obtain surety for payment of the purchase price. It was clearly never the parties' intention for Blakur to actually pay the Purchase Price. The "sale" of the Shares to Blakur must therefore be considered a legal act by gratuitous title.



24. In April 2010 Blakur transferred the Shares to AELITA. On or around 25 August 2010 AELITA subsequently transferred the Shares to five different Panamanian and British Virgin Island companies each for 19.7474% (**exhibit 21**):

1. Escalibra Corporation
2. Trustworthy Service Limited
3. Feorentino Optima Limited
4. Megawealth Finance Limited
5. Anda Management Limited

13

25. The search results from the Ukrainian Securities Commission Database show that in or around April 2011 the Shares were transferred to Olympus (exhibit 21). Press releases of early February of this year quote Smart Holding's supervisory board head, Vadim Novinsky, and report an 'oral agreement' with respect to the sale by Olympus to Smart-Holding of 50% of the Shares (**exhibit 22**). At the time of the issuing of this writ of summons it is not known to Okean and Logistic whether the transfer of shares has actually taken place or will still need to take place.

*The transfer of the Shares is fraudulent*

26. The sale and transfer of the Shares to Blakur (SPA of 26 February 2010) is to the detriment of the creditors of Okean and particularly to Wadan Yards AS, which means that it is voidable on the basis of Section 3:45 of the Dutch Civil Code.

27. The so-called sale of the Shares on the grounds of the SPA is in fact a legal act by gratuitous title. As explained in nos. 21 through 23 it must be assumed that it was never the parties' intention for Blakur to pay the Purchase Price; the Purchase Price was only included in the SPA to create the impression that the purchase agreement was real. The atypical conditions related to the Purchase Price, in light of Blakur's solvency, and specifically the fact that the purchase price would only become payable after twelve months without any surety having to be provided, as well as the fact that it appears that no attempt has been made whatsoever to recover the so-called Purchase Price and the fact that nothing was ever paid for the Shares demonstrate that this was not a proper sale.



28. That it was never the parties' intention for Blakur to pay the Purchase Price is borne out by the fact that the same single director of Blakur signed both the SPA and the promissory note (see no. 23) and the statement regarding the assets and debts of Blakur attached to the request for voluntary dissolution on 30 March 2011. Over a year after the signature of the SPA, Hamburger declared that Blakur has no liabilities vis-à-vis third parties (**exhibit 23**), while the Purchase Price would precisely have become payable then.

29. It follows from the above that by entering into the SPA Okean and Blakur extracted important assets from Okean and in doing so prejudiced the creditors of Okean. It is evident that Okean, and in particular Shaposhnikov (see also no. 8) knew, or rather should have known, that