## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Application Pursuant to 28 U.S.C. § 1782 of OKEAN B.V. and LOGISTIC SOLUTION INTERNATIONAL LIMITED,<br><br>　　　　　Petitioners,<br><br>　– to take discovery of –<br><br>CHADBOURNE & PARKE LLP,<br><br>　　　　　Respondent. | Case No.: 12 Misc 00104<br>ECF Case |

## DECLARATION OF TOM EINERTSEN IN OPPOSITION
## TO RESPONDENT'S MOTION TO QUASH SUBPOENA

TOM EINERTSEN declares as follows:

1.　　I am a Director of Petitioner Okean B.V. ("Okean") and respectfully submit this Declaration in opposition to the motion of Respondent Chadbourne & Parke LLP ("Chadbourne") to quash the Subpoena To Produce Documents, Information, or Objects, dated April 9, 2012 (the "Subpoena"), issued on behalf of Petitioners Okean and Logistic Solution International Limited (together with Okean, "Petitioners"), and to vacate the Order of this Court, dated April 6, 2012, issued pursuant to 28 U.S.C. § 1782.

2.　　Except where indicated otherwise, the facts and matters set forth herein are within my own knowledge and are true to the best of my knowledge, information, and belief.

3.　　It is my understanding, based on my reading of the Declaration of Anna V. Putintseva in Support of Respondent's Motion to Quash Subpoena, dated May 8, 2012 (the "Putintseva Declaration"), that in 2010 Chadbourne was retained by an unidentified British Virgin Islands company "to provide legal advice to it and a group of companies, which included

without limitation" Okean, Mykolayiv Shipyard Okean, Blakur Company Inc. ("Blakur"), Poizanter Holdings Ltd. ("Poizanter"), Fradomna Investments Ltd. ("Fradomna"), and Olympus Investments (2001) B.V. ("Olympus").    Putintseva Decl. ¶ 2.    More specifically, as acknowledged by Ms. Putintseva, Chadbourne was retained in connection with "certain transactional, bankruptcy, and litigation matters concerning the Open Joint Stock Company Wadan Yards Okean ("Wadan Yards")." Id.

**The Fraudulent Scheme Since 2010 And The Writ**

4.    Chadbourne thus represented the very "group of companies" during the very period in which, through a series of interrelated and coordinated transactions, Okean was wrongfully stripped of two substantial assets:  loan receivables in the amount of around EUR 50 million and stock shares for which the EUR 5 million purchase price was never paid.

5.    One of the companies in the group that Chadbourne represented during this time was Blakur, a BVI company that was incorporated on January 21, 2010.  Blakur was a party to a number of these orchestrated transactions and then, on March 30, 2011, Blakur was "voluntarily liquidated" and dissolved as part of the concerted scheme that has harmed Okean. Specifically, the process of voluntary liquidation and dissolution was undertaken despite Blakur's liability to Okean for the EUR 5 million stock sale and following Blakur's fraudulent assignment of the EUR 50 million in loan receivables owed to Okean.

6.    As part of its efforts to pursue its claims against Blakur, Okean undertook an extensive investigation into the surrounding transactions and circumstances.  In my capacity as a Director of Okean, I have been involved in this investigation.  The documents and information that Okean has obtained during the course of this investigation (which is still ongoing) provided the substantiation for the allegations set forth in the Writ of Summons, dated March 19, 2012 (the "Writ"), in the proceeding entitled Okean B.V. and Logistic Solution International Limited v.

Olympus Investments (2001) B.V., Poizanter Holdings Ltd., Fradomna Investments Ltd., Blakur

Company Inc., Judith Hamburger, and Private Joint Stock Company Smart-Holding, which is

pending before the District Court of Amsterdam, the Netherlands (the "Dutch Litigation").  (A

copy of the Writ is annexed as Exhibit A to the Subpoena, where the Subpoena is Exhibit 2 of the

Declaration of Thomas J. Hall in Support of Respondent's Motion to Quash Subpoena.  All

similar citations will hereinafter read "Exhibit __ to the Subpoena.")

7.    In particular, Okean's investigation has uncovered information evidencing the

fraudulent nature of the two related and parallel components of the scheme by which Okean was

damaged as set forth in the Writ:

(a)    the transfer of Okean's 98.74% interest (the "Shares") in the Ukrainian shipping company Wadan Yards to Blakur for a sham promissory note; and the successive transfers of the Shares from Blakur to a number of companies, including Olympus and Private Joint-Stock Company Smart-Holding ("Smart-Holding"); and

(b)    the assignment of debts owed to Okean (the "Loans") – totaling around EUR 50 million – to Blakur for a mere USD 200; and the successive transfer of the EUR 50 million asset to two Cypriot companies, Poizanter and Fradomna.

**First Component Of The Scheme:  Fraudulent Transfers Of The Shares**

8.    Blakur was formed just prior to entering into the Share Sale and Purchase

Agreement No. 114B/10, dated February 26, 2010 with Okean (as amended on March 9, 2010,

the "Share Sale and Purchase Agreement").  (A copy of the Share Sale and Purchase Agreement

is annexed as Exhibit N to the Subpoena.)  Ms. Putintseva acknowledges that Chadbourne was

retained in connection with the "contemplated" Share Sale and Purchase Agreement.  Putintseva

Decl. ¶ 3.

9.    It was under this Share Sale and Purchase Agreement, which Chadbourne

prepared, that newly-formed Blakur obtained Okean's Shares in Wadan Yards for the sham EUR

5 million note (the "Note") – sham because the purchase price was never paid, Blakur has no assets of its own to pay the purchase price, and, as Okean's investigation has revealed, Blakur never had assets to pay the EUR 5 million Note when due.  The additional facts – (i) under the Share Sale and Purchase Agreement that Chadbourne prepared, the purchase price was to be paid twelve months after the closing (without any security or payment guaranty of any kind), (ii) Blakur paid nothing, and (iii) no attempt was made to collect the purchase price – further establish the impropriety of the so-called sale.

10.    That Blakur (as represented by Chadbourne) had no intent to pay the EUR 5 million purchase price for the Shares it purportedly purchased from Okean (also represented by Chadbourne) is also evidenced by the fact that Judith Hamburger (one of the other defendants in the Dutch Litigation) was the sole director of Blakur (and, in that capacity, presumably also represented by Chadbourne), who signed the Share Sale and Purchase Agreement and the sham Note and then, a year later, signed the "Statement of Assets and Liabilities of Blakur Company Inc.," stating that Blakur had no assets and no liabilities.  Contrary to this false Statement – which was prepared while Chadbourne represented Blakur and Okean – the EUR 5 million Note owed by Blakur to Okean was due on February 26, 2011.

11.    It was this false Statement of the Assets and Liabilities of Blakur that was submitted to the British Virgin Islands Financial Services Commission in connection with Blakur's "Voluntary Liquidation" and "Dissolution" – again, all while Chadbourne was representing Blakur and Okean.  (A copy of the Statement of Assets and Liabilities of Blakur as well as the additional documents submitted to the BVI Financial Services Commission is annexed hereto as Exhibit 1.)

12.    Likewise, Blakur's Statement of the Assets and Liabilities showed no assets, because it transferred Okean's Shares in Wadan Yards initially in April 2010 (apparently for no consideration), leading to a series of subsequent transfers, including one in April 2011 to Olympus (another of the defendants in the Dutch Litigation).   Once again, Ms. Putintseva acknowledges that Chadbourne represented Blakur and Olympus "concerning [the] subsequent transactions whereby those [S]hares came to be owned by Olympus."  Putintseva Decl. ¶ 3.

13.    More recently – and while Chadbourne continues to represent Olympus – the Shares were the subject of a sale agreement between Olympus and Smart-Holding (also a defendant in the Dutch Litigation) as reported in the Ukrainian Business Report Daily (a copy of which article is annexed as Exhibit R to the Subpoena), in which it was tellingly reported that, while the local authorities were not able to establish who were the actual shareholders (i.e., who owned the Shares), Smart-Holding "had managed to do this."

**Second And Parallel Component Of The Scheme:  Fraudulent Transfers Of The Loans**

14.    At the same time Chadbourne was representing Okean, Blakur, and Olympus in connection with the interrelated transactions regarding the Shares and the dissolution of Blakur, Chadbourne was also representing Okean, Blakur, Wadan Yards, Poizanter, and Fradomna regarding the assignment of the Loans (Putintseva Decl. ¶ 4) that stripped Okean of EUR 50 million in receivables.  Specifically, Ms. Putintseva acknowledges that Chadbourne represented all sides of the March 2010 assignments from Okean (as lender) and Wadan Yards (as borrower) to Blakur and both sides of the May 2010 assignments from Blakur to Poizanter and Fradomna. Id.  Pursuant to the initial assignment, the Loans receivable totaling around EUR 50 million were assigned to Blakur for a mere USD 200.  (A copy of the Deed of Assignment & Amendment to Term Loan Facility No. 4 and a copy of the Deed of Assignment & Amendment to Term Loan Facility No. 5 are annexed as Exhibits F and G, respectively, to the Subpoena.)  Two months

DOCSNY-505262v2

later, by means of assignments that were signed on behalf of Poizanter and Fradomna by Chadbourne attorneys under a power of attorney, Blakur assigned that same receivable to Poizanter and Fradomna for no consideration. (A copy of the Deed of Assignment & Amendment to Term Loan Facility Agreement No. 4, by and among Blakur, Fradomna and Wadan Yards, is annexed as Exhibit H to the Subpoena. A copy of the Deed of Assignment & Amendment to Term Loan Facility Agreement No. 5, by and among Blakur, Poizanter and Wadan Yards, is annexed as Exhibit I to the Subpoena.)

## Bankruptcy Of Wadan Yards

15.    Ms. Putintseva states that Chadbourne's representation of Okean, Wadan Yards, Blakur, Poizanter, Fradomna and Olympus also included "bankruptcy . . . matters." Id. ¶ 2.

16.    The effect of the assignment of the Loans receivable (under which Wadan Yards was the borrower) from Okean to Blakur and then from Blakur to Poizanter and Fradomna (transactions in which Chadbourne represented each and every party: borrower, lender, initial assignor, initial assignee, subsequent assignor and subsequent assignees) was to leave Poizanter and Fradomna (who paid no consideration for the EUR 50 million Loans receivable under the transactional documents assigned by Chadbourne) as the major creditors of Wadan Yards, which filed for bankruptcy in the Ukraine on October 10, 2011.

17.    Shortly after the transfer of the Loans receivable to Poizanter and Fradomna, both companies were granted extremely favorable security rights by the management of Wadan Yards. The decision to grant these rights was taken by Wadan Yard's management a mere three days before the date of transfer. Specifically, in a meeting of the Supervisory Board of Wadan Yards on May 11, 2010, Chairman Igor Shaposhnikov (who was also a director of Okean and responsible for signing or authorizing certain of the transactions regarding the fraudulent transfer of the Shares) tabled the resolution to authorize the Wadan Yards General Manager to approve

6

the transfer of the Loans from Blakur to Poizanter and Fradomna.  (A copy of the Wadan Yards minutes of the May 11, 2010 meeting of the Supervisory Board is annexed to the Subpoena as Exhibit S.)  Then on May 14, 2010, Blakur transferred the Loans pursuant to Deeds of Assignment that were signed by Chadbourne on behalf of Poizanter and Fradomna.  (A copy of the respective Deeds of Assignment are annexed to the Subpoena as Exhibits H and I.)  Although there were various references in the documents to the prospect of each of Blakur, Poizanter, and Fradomna providing further financing to Wadan Yards, no such financing was made available – resulting in the Wadan Yards bankruptcy.

18.     It is notable that the transfer of the Shares took place prior to the transfer of the Loans.  The most likely reason for this was to secure control over Wadan Yards (through Okean) and, in turn, to ensure that Wadan Yards would be in a position to grant favorable security rights to Poizanter and Fradomna once they had secured the rights to the Loans.

19.     The claims of major creditors Poizanter and Fradomna that were filed in the Wadan Yards bankruptcy case were signed by a Chadbourne attorney under a power of attorney. (Copies of the Petitions of Fradomna and Poizanter, respectively, to be recognized as competitive creditors and submitted to the Wadan Yards bankruptcy case are annexed to the Subpoena as Exhibits O and P.)  (This same Chadbourne attorney also had a power of attorney from Blakur.  See Exhibit C to the Subpoena.)  Likewise, the claim of Olympus in the Wadan Yards bankruptcy was also prepared and filed by Chadbourne.  (A copy of the Petition of Olympus to be recognized as competitive creditors and submitted to the Wadan Yards bankruptcy case is annexed to the Subpoena as Exhibit Q.)  Again, Ms. Putintseva acknowledges (Decl. ¶ 5) that Chadbourne's representation of the "group of companies" included the bankruptcy claims of Poizanter, Fradomna, and Olympus – all dated November 22, 2011.

DOCSNY-505262v2

20.     The links in the fraudulent chain of transactions in which Chadbourne represented all of the parties is evidenced by Chadbourne's own "transactional, bankruptcy, and litigation" (id. ¶ 2) documents.  The systematic structuring of this scheme is clear.  For example, the March 16, 2010 bankruptcy filing of Wadan Yards Group AS ("WYGAS") was on the heels of the February 26, 2010 Share Sale and Purchase Agreement by which Okean transferred its Wadan Yards Shares to Blakur (who had been incorporated a few weeks earlier on January 21, 2010) for a sham Note (see Exhibit N to the Subpoena).  As detailed above, Okean's transfer of the Shares led to the series of transactions by which Olympus claimed ownership of the Shares in the Wadan Yards bankruptcy; the parallel assignment of the Loans by Okean to Blakur during the same time period led to the subsequent transactions by which Poizanter and Fradomna claimed ownership of the Loans receivable in the Wadan Yards bankruptcy.

21.     Chadbourne's representation of every one of the parties on every side of every one of the salient corporate and bankruptcy-related transactions making up the links in this fraudulent scheme leads to the inescapable – indeed, the only reasonable and logical – conclusion that Chadbourne's activities facilitated and furthered this scheme.  The breadth and depth of Chadbourne's involvement during the operative period with the companies who were the tools used to implement the fraud perpetrated on Okean is beyond dispute.

**Ongoing Investigation Reveals The Existence Of The Fraudulent Scheme – And Chadbourne's Representation Of The Wrongdoers – Beginning Prior to January 2010**

22.     As I stated above, Okean's investigation concerning the transactions and circumstances surrounding the WYGAS bankruptcy and the damages to Okean resulting from the fraudulent transfers of the Shares and Loans receivables is ongoing.  In that regard, our investigation has revealed further evidence of the fraudulent scheme that is the subject of the claims in the Writ, which evidence was uncovered subsequent to the filing of the Writ in March

2012.  This additional evidence reveals who was orchestrating this scheme and also shows that Chadbourne has been involved even prior to its 2010 representation of Blakur and the others in "the group of companies" that are parties to the 2010 and 2011 transactions in question.

23.      As detailed below, the fraudulent transactions regarding the Shares and Loans receivable were carried out at the instruction of the majority shareholders of WYGAS, the sole shareholder of Okean and thereby the parent of Wadan Yards, once they realized that WYGAS was about to go into liquidation. Okean's investigation reveals that the shareholders knew that a liquidator would take immediate steps to take over control of Okean in order to preserve its valuable assets for the benefit of the creditors of WYGAS and that, in that event, the shareholders would be left with nothing. They therefore put in place a series of transactions designed not only to strip Okean of those assets for only nominal consideration, but also to conceal the fact of their involvement. They also took steps to postpone the date of the WYGAS bankruptcy in order to give their scheme time to take effect and resorted to the back dating of certain transactional documents in order to create the appearance that the transactions had been completed prior to the date of the bankruptcy filing (March 16, 2010), when in fact they had not.

24.      Chadbourne's involvement in the scheme includes the following:

(a)      Lawyers from Chadbourne's Moscow office acted on behalf of the majority shareholders of WYGAS and were involved in the orchestration of the fraudulent transactions.  In particular, lawyers from Chadbourne's Moscow office played an active role in the appointment to the boards of WYGAS of Igor Shaposhnikov and worked closely with Mr. Shaposhnikov, who, as explained above, authorized the transfer of the Shares out of Okean, and put in place the arrangements by which the assignees of the Loans, Poizanter and Fradomna, received security rights over assets owned by Wadan Yards worth many millions of dollars (in return for their combined investment of a mere USD 200).

(b)      Lawyers from Chadbourne's Kiev office (as has been admitted by Ms. Putintseva) acted on behalf of the various entities, including Okean, Wadan Yards, Blakur, Poizanter, Fradomna, and Olympus, through which the Shares and Loans were misappropriated.

(c)     I refer below to additional evidence which shows that lawyers in Chadbourne's Kiev office participated in the apparent back dating of transactional documents, whose effect was to transfer the Loans from Okean to Blakur purportedly prior to the WYGAS bankruptcy filing.

25.     By acting on behalf of the "upstream" companies who originally controlled the Shares and Loans receivable assets shortly prior to the bankruptcy filing of WYGAS on March 16, 2010, and also the "downstream" entities which received the Shares and Loans following their transfer away from Okean, Chadbourne lawyers had a panoramic overview of the fraudulent scheme, and were involved at every stage of its implementation.

**The Identity Of The "Upstream" Companies And Of Their Beneficial Owner**

26.     At the time of the liquidation of WYGAS in March 2010, the legal owner of 70% of its shares was Wadan Holding S.a.r.l. ("Wadan Holding"), a company incorporated in Luxembourg. See Exhibit 2 annexed hereto. These shares were pledged in favor of Templestowe Trading Corporation ("Templestowe"), a company incorporated in the British Virgin Islands. See Exhibit 3 annexed hereto.  Templestowe is also the ultimate beneficial owner of Wadan Holding, via its Luxembourg subsidiary Yards Invest SA.  See Exhibit 4 annexed hereto.

27.     It is my understanding that the ultimate beneficial owner of Wadan Holding and Templestowe is Igor Yusufov, a Russian citizen.  This understanding is based on both my personal knowledge and various documents to which I refer below. I set out below the relevant background in the course of which I will also draw attention to certain facts which support my belief that the majority shareholders were responsible for the fraudulent transactions at issue.

28.     I joined Aker Kvaerner Yards AS, a large and well known Norwegian shipbuilding company, in February 2003. In 2004, the company changed its name to Aker Yards ASA ("Aker Yards") following a stock market listing. In or around the middle of 2007, I was appointed President of the merchant vessels division and became responsible for the operations of four

10

main subsidiaries: Aker Yards MTW Werfts GmBH and Aker Yards Warnow Werft GmBH in Germany, Aker Yards Okean OJSC in the Ukraine, and Aker Yards Florø AS in Norway. Aker Yards Okean OJSC was owned through Okean.

29.    In March 2008, Aker Yards Holding AS (a subsidiary of Aker Yards) and FLC West Holding S.a.r.l. ("FLC West") entered into a share purchase agreement whereby FLC West purchased  70 % of the shares in a holding company which, at the time of the sale, owned the German and Ukrainian companies (including Okean) to which I have referred above for the sum of EUR 292 million. See Exhibit 5 annexed hereto. The holding company subsequently changed its name to Wadan Yards Group AS ("WYGAS").

30.    I played a significant role on behalf of Aker Yards in the negotiations with the new shareholders. In the months leading up to the closing of the deal which took place on July 28, 2008, it became clear that Igor Yusufov was the main owner behind FLC West (the minority owner being Andrey Burlakov). I had meetings with Mr. Yusufov in Germany on June 11, 2008, where he received a full tour/review of the two German Yards. Together with the top management of Aker Yards, I also had a further meeting with Mr. Yusufov in Oslo at the headquarter of Aker Yards on June 23, 2008.  Vitaly Yusufov, the son of Igor Yusufov, attended the closing meeting at the offices of the law firm Wikborg Rein, who represented Aker Yards, on July 28, 2008. Vitaly Yusufov informed those present at the meeting that the FLC West shares in WYGAS had been pledged to Templestowe as security for loans made under a facility agreement dated July 24, 2008, a copy of which is annexed hereto as Exhibit 6. Vitaly Yusufov also made clear during the meeting that he acted for Templestowe, instructing that Templestowe's security interest in the shares should be recorded in WYGAS's share register.

31.    I moved from Aker Yards to WYGAS when the deal was closed between Aker Yards and FLC West.  At the end of 2008, it was apparent that WYGAS was facing financial difficulties as a result of the financial crisis and also that FLC West had been unable to attract the Russian shipbuilding orders for which they had planned.  This problem was further intensified by a constant battle between the two shareholders:  FLC West and Aker Yards. Furthermore, in early 2009, it also became clear that there was a dispute between Messrs. Burlakov and Yusufov, who, between them, controlled FLC West.  Under these circumstances, it was impossible to manage the group, and I, together with my core management team, therefore decided to leave the company in early 2009.  However, numerous attempts to find an amicable solution with Mr. Burlakov failed, with the result that the management had to take legal action.  The legal proceedings ended with a decision by the Oslo City Court, on March 27, 2009, to grant the management full arrest in all the shares in the company. That same day I contacted Vitaly Yusufov and informed him of the decision made by Oslo City Court (see Exhibit 7 annexed hereto). I was then invited to a meeting with Igor Yusufov in his office in Moscow on April 1, 2009.  This meeting was attended by both Igor and Vitaly Yusufov in addition to me and my CFO, Per Ødegaard. The purpose of the meeting was to update Igor Yusufov on the financial difficulties facing WYGAS, and to inform him that I, together with my core management team, wanted to leave the company. Mr. Yusufov could fully understand our decision given the difficult situation we faced with Mr. Burlakov, and promised to support the terms for our exit.  Within two weeks after the meeting with Mr. Yusufov, we reached an agreement with WYGAS for leaving the company.

32.    On March 19, 2009, Wadan Holding entered into an agreement to purchase FLC West's 70% shareholding in WYGAS (see Exhibit 8 annexed hereto).  As I explained above, the

owner of Wadan Holding is Templestowe, via Templestowe's 100% subsidiary Yards Invest SA. Although the shares remained pledged to Templestowe, the transaction effectively converted Templestowe's security interest in the WYGAS shares into an equity holding.

33.     In June 2009, WYGAS's German subsidiaries became insolvent, and its shipyard assets were procured by Nordic Yards AG, an entity that is publicly associated with Vitaly Yusufov (see Exhibit 9 annexed hereto). Consequently, Wadan Yards Ukraine (held via Okean) became WYGAS's most valuable remaining asset (a point that the Oslo City Court noted when it ordered the liquidation of WYGAS in March 2010 (see Exhibit 10 annexed hereto)).

34.     As detailed above, Wadan Yards was then transferred from Okean to Blakur shortly prior to the bankruptcy of WYGAS. This transfer was orchestrated by WYGAS's majority shareholders.

35.     As I have explained, I was aware, not least from the occasions on which I met with Igor Yusufov, that Mr. Yusufov was the ultimate owner of Wadan Holding and Templestowe.  A number of documents from 2009 support my understanding, including the following:

(a)     The minutes of the WYGAS shareholders meeting on March 25, 2009 record that Vitaly Yusufov attended by invitation as a representative of Wadan Holding (see Exhibit 11 annexed hereto).

(b)     A letter from Hjort, legal representatives of WYGAS, dated August 24, 2009, and sent to the Norwegian Register of Business Enterprises includes references to communications with Vitaly Yusufov acting on behalf of Wadan Holding, including specific references to emails containing instructions in relation to the Wadan Holding shares in WYGAS, and to the participation of Vitaly Yusufov in a phone conference on June 25, 2009 (see Exhibit 12 annexed hereto).

(c)     A letter from the law firm Thommessen, representing both Templestowe and Wadan Holding, to the Norwegian Register of Business Enterprises, dated September 9, 2009, confirms that Vitaly Yusufov was representing Wadan Holding (see Exhibit 13 annexed hereto).

DOCSNY-505262v2

**Implementation Of The Fraudulent Scheme Through The "Downstream" Entities**

36.    Following the initiation of bankruptcy proceedings against WYGAS in November

2009, the shareholders carried out the implementation of their fraudulent scheme to strip Okean

of its valuable assets before the appointment of a liquidator.

37.    The following events in connection with the bankruptcy occurred in relatively

short order:

(a)    On November 20, 2009, two former employees of WYGAS filed a bankruptcy petition with the Oslo District Court (see Exhibit 14 annexed hereto).

(b)    Following the submission of the petition, the Oslo District Court directed (at the request of Thommessen, acting on behalf of Wadan Holding and Templestowe) a WYGAS shareholders meeting at the offices of a court appointed administrator (see Exhibit 15 annexed hereto).

(c)    A WYGAS shareholders meeting took place on December 4, 2009 as directed by the Court, in the course of which new directors (including Igor Shaposhnikov) were appointed to the board of WYGAS (see Exhibit 16 annexed hereto).

(d)    Acting on behalf of Wadan Holding and Templestowe, the Oslo based law firm, Thommessen, sought to negotiate with the employees in an attempt to postpone the hearing of the WYGAS petition. On December 11, 2009, Thommessen wrote to the lawyers acting for the ex-employees who had filed the bankruptcy petition to propose settlement terms which included the withdrawal of the bankruptcy petition (see Exhibit 17 annexed hereto).

(e)    A settlement agreement was reached on January 19, 2010.  It was a term of the agreement that the employees would agree to postpone the bankruptcy proceedings "for a minimum of 4 weeks" (see Exhibit 18 annexed hereto).

(f)    On January 21, 2010, Judith Hamburger procured the incorporation of Blakur in the British Virgin Islands through Gold-Coast Directors Limited ("Gold-Coast"), a company registered in Anguilla (of which Ms. Hamburger appears to have been the sole director) (see Exhibit 19 annexed hereto).

(g)    On January 28, 2010, Ms. Hamburger consented to the appointment of Gold-Coast as a director of Blakur, with a reference to Salix Services AG alongside Ms. Hamburger's name in the consent form (see Exhibit 20 annexed hereto).

14

(h)     On February 18, 2010, Ms. Hamburger replaced Gold-Coast as the sole director of Blakur (see Exhibit 21 annexed hereto).

(i)     On February 26, 2010, Okean and Blakur entered into the Share Sale and Purchase Agreement in accordance with which the Shares were transferred from Okean to Blakur (see Exhibit N to the Subpoena).  This and the subsequent transfers of the Shares have been described above.

(j)     On March 2, 2010, Okean (at least according to the dates on the transaction documents, on which see further below) assigned the Loans to Blakur with a total value of almost EUR 50 million.  In return, Okean received consideration of a mere USD200 (see Exhibits F and G to the Subpoena).  As explained above, the Shares were then transferred to two Cypriot companies, Poizanter and Fradomna, and valuable security rights were granted to these companies as security for the Loans (see Exhibits H and I to the Subpoena).

(k)     On March 16, 2010, WYGAS was declared bankrupt (see Exhibit 10 annexed hereto).

**Evidence Of A Single Fraudulent Scheme**

38.     The fraudulent scheme to transfer the Shares and Loans from Okean to Blakur in advance of the liquidation of WYGAS, and then to put in place valuable security rights over the assets of Wadan Yards as security for the loans, was a single scheme orchestrated by the majority shareholders of WYGAS. The link between the upstream and downstream entities as described above can be demonstrated by examining the roles played by Philippe Meyer, Igor Shaposhnikov, and Chadbourne. In addition, I will also refer to evidence that Igor Yusufov (who, as I have already explained, was the ultimate beneficial owner of Wadan Holding and Templestowe) has maintained control over Wadan Yards even after the transfer of the Shares from Okean to Blakur.

Philippe Meyer

39.     Mr. Meyer is a partner in the Zurich based law firm of Peter Meyer Hurlimann. Together with Judith Hamburger, he was one of the founding members of Salix Services AG, which was registered in Zurich on November 6, 2009 (see Exhibit 22 annexed hereto) and was

DOCSNY-505262v2

the corporate vehicle employed by Ms. Hamburger in setting up Blakur in the British Virgin Islands.  Ms. Hamburger, a defendant in the Dutch Litigation, was a director of Blakur and was heavily involved in the transactions between the "downstream" companies, as described herein.

40.    The involvement of Mr. Meyer's law firm, Peter Meyer Hurlimann, is seen in the letter written by Chadbourne on March 31, 2010 enclosing the agreements to assign the Loans from Okean to Blakur and requesting that Peter Meyer Hurlimann arrange for their execution on behalf of Blakur (see Exhibit 23 annexed hereto).

41.    In addition, it is my understanding that, when Russell Crumpler of KPMG was appointed as liquidator of Blakur, KPMG made contact with Ms. Hamburger to ask for information about Blakur's affairs while she had been a director. KPMG spoke with Ms. Hamburger over the telephone on January 5, 2012.  Mr. Crumpler has confirmed to me that Mr. Meyer was present with Ms. Hamburger on that call.  A few days later, Ms. Hamburger sent a letter dated January 11, 2012 to Mr. Crumpler enclosing a file of documents, and it is relevant to note that she did so on the letterhead of Salix Services AG (see Exhibit 24 annexed hereto).

42.    Mr. Meyer's close involvement with the affairs of the "upstream" companies, including Wadan Holding and Templestowe, can be shown as follows:

(a)    The loan agreement between FLC West and Templestowe dated July 24, 2008 provides for notices to Templestowe to be sent to Mr. Meyer and provides the email address "pmh@pmhpartners.com" (see Exhibit 6 at § 15.3).

(b)    Public records for Wadan Holding record Mr. Meyer as its administrator/manager (see Exhibit 2 annexed hereto).

(c)    Each of the sale and purchase agreement and set off agreement dated March 19, 2009 between Wadan Holding and FLC West provides, in the notice provision, for notices to Wadan Holding to be sent to Mr. Meyer (see Exhibit 25 annexed hereto at p. 9 and Exhibit 26 annexed hereto at p. 7).

DOCSNY-505262v2

(d)    The basis of the authority by which Igor Shaposhnikov and Konstantin Konstantinov (of Chadbourne's Moscow office) attended the Extraordinary General Meeting ("EGM") of WYGAS on December 4, 2009 on behalf of Wadan Holding was a power of attorney signed by Mr. Meyer, as is recorded in the minutes of the EGM (see Exhibit 16 annexed hereto).  This gave rise to the appointment of Mr. Shaposhnikov to the boards of both Okean and Wadan Yards Ukraine shortly after that.

(e)    Mr. Meyer is the sole director of Nordic Yards (see Exhibit 41 annexed hereto), which as indicated in paragraph 33 above, is an entity that is publicly associated with Vitaly Yusufov.

43.    This documentary evidence indicates that Mr. Meyer was not only a close adviser of Templestowe and Wadan Holding, but also instrumental in handling the arrangements by which Judith Hamburger and Igor Shaposhnikov gained control over Okean and Blakur, the two downstream entities through which the transfer of the Shares and Loans out of Okean was organized.

44.    Notably, when Ms. Hamburger arranged for the incorporation of Blakur in the British Virgin Islands, she chose to use Morgan & Morgan Trust Services Limited as its registered agent, the same registered agent as for Templestowe (see Exhibits 27 and 28 annexed hereto).  This is unlikely to be a coincidence, given that the Association of Registered Agents of the BVI (membership of which is not compulsory) lists almost 100 companies among its members.  I consider this to be further evidence that Templestowe and Blakur were under the same ultimate beneficial ownership and control at the time of the sale of the Shares and Loans from Okean to Blakur.

### Igor Shaposhnikov

45.    The involvement of Mr. Shaposhnikov at almost every stage of the fraudulent transactions also shows that the transactions were a single scheme orchestrated by the majority shareholders of WYGAS.  Mr. Shaposhnikov's involvement in the scheme includes the following:

DOCSNY-505262v2

(a)     Mr. Shaposhnikov was appointed as Chairman of the Board of WYGAS at the EGM held on December 4, 2009.  Present at the meeting were the representatives of Wadan Holding (including a Chadbourne attorney as explained below).  The minutes suggest that the only other shareholder at the time of the EGM (Mandataria Finance SA) was given notice of the meeting, but did not attend.   Mr. Shaposhnikov's appointment as Chairman was passed by a unanimous resolution (see Exhibit 16 annexed hereto).

(b)     On December 4, 2009, Mr. Shaposhnikov was appointed to the board of directors of Okean (see Exhibit 29 annexed hereto).

(c)     On February 1, 2010, Mr. Shaposhnikov was appointed to the board of directors of Wadan Yards (see Exhibit 30 annexed hereto).

(d)     Mr. Shaposhnikov was copied on email correspondence dated March and April 2010 between the liquidators and representatives of Wadan Holding.  I refer in more detail to this correspondence below in the context of discussing Chadbourne's involvement in the scheme (see Exhibit 31 annexed hereto).

(e)     The documents transferring both the Shares and the Loans from Okean to Blakur were authorized by Mr. Shaposhnikov on behalf of Okean, and executed by Judith Hamburger on behalf of Blakur (see Exhibits F, G, and N to the Subpoena, and Exhibit 42 annexed hereto).

(f)     The minutes of the Wadan Yards Board Meeting dated May 11, 2010 identify Mr. Shaposhnikov as the Chairman of the Supervisory Board of Wadan Yards (see Exhibit 32 annexed hereto).  At the Board Meeting, Mr. Shaposhnikov is recorded as informing the company of the assignments of the Loans.  Following a further introduction by Mr. Shaposhnikov, the Board then resolved to enter into various security agreements in favor of Poizanter and Fradomna.  Id.

(g)     A mere six days prior to the bankruptcy filing of WYGAS, Mr. Shaposhnikov resigned his position as Chairman of the Board of WYGAS (see Exhibit 43 annexed hereto).   The timing of this resignation is certainly no coincidence.  Furthermore, the resignation was organized by the law firm Thommessen representing the majority shareholder, Wadan Holding.

46.     A letter sent by Johan Ratvik of DLA Piper, the receiver and liquidator of WYGAS, dated December 13, 2010, states:  "The bankruptcy administration has made several attempts to contact Mr. Shaposhnikov and the main shareholder of Wadan [Wadan Holding]

without any reply." The letter then states that, in the view of the liquidator, Mr. Shaposhnikov's involvement in the transfer of the Shares (which, according to the assessments of the liquidator, occurred after the WYGAS bankruptcy petition was filed and was an illegal transaction that should be revoked) was a violation of Norwegian criminal law (see Exhibit 33 annexed hereto).

**Chadbourne's Involvement In Furtherance Of The Fraudulent Scheme**

The "Downstream" Companies

47.     The evidence of Chadbourne's involvement in the "downstream" aspects of the scheme have already been explained in detail above. The Putintseva Declaration states that Chadbourne was instructed in 2010 by a "British Virgin Islands-based company" to provide advice to a number of entities as follows :

     (a)    Okean, the owner and eventual vendor of the Shares and Loans;

     (b)    Blakur, the newly formed BVI company which bought the Shares and Loans from Okean and then quickly sold them to other companies;

     (c)    Olympus, the Dutch company which ended up with the Shares, although only after they had passed through the hands of Blakur and a series of intermediary companies;

     (d)    Poizanter and Fradomna, the Cypriot companies to whom the Loans were assigned by Blakur;

     (e)    Wadan Yards, the Ukrainian subsidiary of Okean which, following its sale by Okean to Blakur, provided valuable security worth millions of dollars, to Poizanter and Fradomna shortly after they had bought the Loans from Blakur for USD 200.

48.     In light of what I understand to be strict policies that a firm such as Chadbourne must have in place to guard against conflicts of interest, the only plausible explanation for Chadbourne agreeing to act for each of these companies is, first, that each entity had the same ultimate beneficial owner (and was not therefore acting at arms length), and second, that Chadbourne was fully aware of that.

The "Upstream" Companies

49.    Remarkably, Chadbourne's representation of companies connected to the fraud extends beyond those companies named directly by Ms. Putintseva.  As I have mentioned already, a number of documents show that Chadbourne acted on behalf of the majority shareholders in WYGAS, including specifically Wadan Holding and Templestowe.  It also appears that Chadbourne worked closely with Igor Shaposhnikov, both before as well as after the transfer of the Shares from Okean to Blakur.  In particular, it is clear from the material already available that Konstantin Konstantinov (a partner in Chadbourne's Moscow office) and Anna Kelina (an associate in Chadbourne's Moscow office) acted at various stages for Wadan Holding and Templestowe prior to the transfer of the Shares from Okean to Blakur.  Given these materials, the unidentified "British Virgin Islands-based company" to which Ms. Putintseva refers (Putintseva Decl. ¶ 2) must surely be Templestowe.

50.    The evidence of Chadbourne's representation of Wadan Holding/Templestowe includes the following:

(a)    The minutes for WYGAS's EGM of December 4, 2009, at which Mr. Shaposhnikov was appointed as Chairman of the Board, contain a list of attendees.  The list includes the following:  "Wadan Holding S.A.R.L represented by Hans I. Stensholdt, Konstantin O. Konstantinov and Igo[r] Shaposhnikov in accordance with authority from Wadan Holding S.A.R.L through Dr. Philippe Meyer of November 30, 2009" (see Exhibit 16).

(b)    Mr. Konstantinov and Ms. Kelina are included in a series of email exchanges dated March 17, 2010 – April 8, 2010 between representatives of Wadan Holding/Templestowe and representatives of WYGAS including Johan Ratvik (the court appointed liquidator for WYGAS) (see Exhibit 31).  A number of these exchanges are either sent to/from or are copied to Konstantin Konstantinov, Anna Kelina and Igor Shaposhnikov.  The emails describe Mr. Konstantinov as the representative of Wadan Holding.  An email on March 17, 2010 from Jorn Uggerud (from the law firm Hjort representing WYGAS) to Mr. Ratvik says:  "Shaposhnikov is chairman of the board of WYGAS and you received his mail address in the cc-box yesterday.  I don't have his telephone number, but the easiest way to reach is probably via Konstantin Konstantinov" (id.).

DOCSNY-505262v2

(c)     Mr. Konstantinov and Ms. Kelina can be seen acting on behalf of Wadan Holding in separate communications with Arntzen de Besche Advokatfirma AS, a law firm acting on behalf of employees of WYGAS. In particular, Mr. Konstantinov, Ms. Kelina, and Mr. Shaposhnikov are copied on communications that relate to the settlement reached with WYGAS employees, which included, as I have explained above, a temporary stay of the bankruptcy proceedings during which time lawyers from Chadbourne's Kiev office assisted in finalizing the February 26, 2010 agreement for the transfer of the Wadan Yards Shares to Blakur (see Exhibit 34 annexed hereto).

(d)     In an exchange of emails between Mr. Konstantinov and Mr. Ratvik over March 17 – April 6, 2010, it is clear that the references to Mr. Konstantinov's "client" refer to the WYGAS shareholders. In addition, Mr. Ratvik has informed me that on March 22, 2010 (a few days following the commencement of the bankruptcy), he spoke over the telephone with Mr. Konstantinov of Chadbourne and Heidi Dillevig of Thommessen about the possibility of the majority shareholders purchasing assets. It was clear to Mr. Ratvik that both Chadbourne and Thommessen represented the majority shareholders, Wadan Holding. Mr. Ratvik subsequently sent emails to Mr. Konstantinov on March 24 and April 6 to enquire about progress, but heard nothing back from Mr. Konstantinov in reply (no doubt because, as Mr. Konstantinov would have been well aware, Mr. Konstantinov's clients had by that stage obtained the relevant assets without Mr. Ratvik's knowledge) (see Exhibit 35 annexed hereto).

(e)     Evidence that Igor Yusufov has maintained control over Wadan Yards and has agreed to sell 50% of the Shares to Smart Holding

51.     On December 17, 2010, several months after the misappropriation of the Shares from Okean to Blakur, the General Director of Wadan Yards, Mr. Romanchyk, wrote to Igor Yusufov in terms that made clear that Mr. Yusufov was the owner of Wadan Yards (see Exhibit 36).

52.     More recently, in May 2012, the bankruptcy of Wadan Yards was brought to an end by court order, and a new Supervisory Board was elected comprising six individuals whose names are as follows:

(a)     Nikolay Dovgalyuk;

(b)     Sergey Kopilov;

DOCSNY-505262v2

      (c)     Alexey Ulyanov;

      (d)     Pavel Konstantinov;

      (e)     Andriy Vyshnevsky; and

      (f)     Olga Fayzieva.

53.    Three of the individuals – those of Dovgalyuk, Kopilov and Ulyanov – are Russian citizens; two of whom (Kopilov and Ulyanov) served previously on the Supervisory Board with Blik Harm Frederik (the sole director of Olympus).  Of the remaining three, two – Vyshnevsky and Fayzieva – are lawyers with a Ukrainian law firm called EnGarde which lists Smart Holding as one of its key clients (see EnGarde, CHAMBERS AND PARTNERS, http://www.chambersandpartners.com/UK/Firms/203779-47234 (last visited June 19, 2012); and the third, Mr. Konstantinov, according to the website of the National Commission for Securities and Stock Market of Ukraine (www.smida.gov.ua), was in May 2011, appointed Chairman of Joint Stock Company Kherson Shipyard, a company in which Smart Holding is a shareholder. This is consistent with Olympus having sold 50% of the Shares to Smart Holding, as was reported in the press in February 2012, and of Olympus being owned by Igor Yusufov.

<u>The Back Dating Of Documents</u>

54.    Chadbourne must have been a knowing participant in the back dating of the agreements to assign the Loans from Okean to Blakur.

55.    The agreements whereby Okean agreed to assign the Loans to Blakur are each dated March 2, 2010 and are executed by Mr. Shaposhnikov on behalf of Okean, and by Ms. Hamburger on behalf of Blakur (see Exhibits F and G to the Subpoena). I note that in her Declaration, Ms. Putintseva acknowledges that Chadbourne provided legal advice in connection with these agreements.

DOCSNY-505262v2

56.     On March 31, 2010, some four weeks after the documents purport to have been executed, a letter was sent by Anna Putintseva of Chadbourne, on Chadbourne letterhead, to Peter Meyer Hurlimann (see Exhibit 23).  The letter attached copies of agreements assigning the Loans, and requested that arrangements be made for the execution of the very same agreements by Blakur.   Plainly, these agreements were back dated, no doubt to create the misleading impression that they had been completed prior to the start of the liquidation of WYGAS on March 16, 2010 (otherwise any purported assignment would risk being ineffective due to the declaration of bankruptcy). Notably, Chadbourne became aware of the liquidation of WYGAS as soon as it occurred; Mr. Konstantinov was contacted by the liquidator, Mr. Ratvik, the very next day.

Further Information As To The Fraudulent Nature Of The Scheme

57.     The following articles, three of which appeared in the respected Norwegian publication Finansavisen, underscore the involvement of the "upstream" companies and the Yusufovs in the subject transactions and the fraudulent nature of those transactions.  See Exhibit 37 (Finansavisen article published December 19, 2009), Exhibit 38 (Finansavisen article published March 17, 2010), Exhibit 39 (Finansavisen article published March 26, 2010), and Exhibit 40 (Reuters.com article published June 15, 2012).

DOCSNY-505262v2

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 18, 2012

TOM EINERTSEN