UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

In re Application Pursuant to 28 U.S.C. § 1782 of Okean   :        12 Misc. 104 (PAE)
B.V. and Logistic Solution International to Take       :
Discovery of Chadbourne & Parke LLP           :        OPINION & ORDER

------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

      This case involves, and this decision resolves, an application pursuant to 28 U.S.C.

§ 1782 to take discovery for use in a foreign proceeding, specifically, a civil lawsuit filed in the

District Court of Amsterdam, the Netherlands.  The application, made in 2012, has been the

subject of several prior decisions, in which the Court has addressed, *inter alia*, claims that

production of the requested documents is barred by the attorney-client privilege and by various

foreign laws.

      Most recently, the Court directed respondent Chadbourne & Parke LLP ("Chadbourne"),

a law firm that is not a party to the foreign proceeding, to produce to petitioners Okean B.V. and

Logistic Solution International Limited (collectively, "Okean"), for review on an attorneys'-

eyes-only basis, a sample of more than 600 documents responsive to Okean's § 1782 subpoena.

*See* Dkt. 62–63.  These documents were in Chadbourne's custody because they involved work

that the firm's Russian or Ukrainian counsel had done.  At the Court's direction, Chadbourne, at

its own expense, had translated these documents into English from the native Russian or

Ukrainian, in order to facilitate the Court's resolution of the § 1782 application.  The purpose of

Okean's counsel's review of these documents was to enable counsel, and thereafter the Court, to

assess, on a non-speculative basis, the probative value of these materials.  Following review of

those documents by Okean's counsel, the Court directed the parties (1) to brief whether any

further review or production of any documents is justified by the probative value, if any, of those

documents; and (2) to submit for *in camera* review those documents from among the 600 that

Okean regarded as probative.

The Court has now closely reviewed the parties' submissions and the sample documents.

Based on that review, the Court holds that production of documents pursuant to the subpoena

would be unduly burdensome and intrusive to Chadbourne; and that the probative value of these

documents does not justify imposition of these burdens and intrusions.  Chadbourne's motion to

quash Okean's subpoena is, therefore, granted.

## I.      Background

On April 4, 2012, Okean moved in this District for an order authorizing it to take

discovery from Chadbourne, pursuant to § 1782, for use in a lawsuit pending before the District

Court of Amsterdam, in the case of *Okean B.V. and Logistic Solution International Limited v.*

*Olympus Investments (2001) B.V., Poizanter Holdings Ltd., Fradomna Investments Ltd., Blakur*

*Company Inc., Judith Hamburger, and Private Joint-Stock Company Smart Holding*.  *See* Dkt. 1.

In that lawsuit, Okean seeks to void, as fraudulent under the Dutch Civil Code, certain

transactions entered into prior to the bankruptcy of Wadan Yards Group ("WYGAS").

Chadbourne is not a party to the Dutch litigation.  The documents it held were, however,

claimed to be relevant because Chadbourne had been retained by several companies, including

Okean and several of the defendants in that lawsuit, to provide legal advice and services in

connection with either the transactions in question or events leading to them.  In addition to

Okean, the group of companies thus represented by Chadbourne included:  Mykolayiv Shipyard

Okean ("Wadan Yards"); Blakur Company Inc. ("Blakur," a British Virgin Islands company);

Poizanter Holdings Ltd. ("Poizanter," a Cyprus company); Fradomna Investments Ltd.

("Fradomna," a Cyprus company); and Olympus Investments (2001) B.V. ("Olympus," a Dutch

company).  *See* Dkt. 12 (Declaration of Anna V. Putintseva in Support of Respondent's Motion
to Quash Subpoena) ¶ 2.

In connection with its § 1782 application, Okean submitted a proposed subpoena seeking
production of all documents in Chadbourne's possession, custody, or control, or that of its
agents, created from November 1, 2009 to the present, that are responsive to any of 21 separately
numbered document requests.  Dkt. 11 Ex. 2 at 3, 6.  Specifically, the subpoena seeks, *inter alia*,
all (1) "documents concerning any acts" taken by Chadbourne at the direction of Chadbourne's
clients Blakur, Poizanter, and Fradomna during the relevant time period, *id.* at 6, 7;
(2) "documents concerning the negotiation and drafting of, and performance under" nine
separate agreements or transactions entered into by one or more of Chadbourne's clients, *id.* at 7,
8; (3) "documents concerning" certain pleadings filed by Chadbourne's clients in the Wadan
Yards bankruptcy proceedings pending in Ukraine, *id.* at 8; and (4) "documents concerning the
signing of the Deeds of Assignment and Amendment to Term Loan Facility No. 1, No. 4 and No.
5, by and among Okean B.V., Blakur and Wadan Yards," *id.* at 10.

On April 6, 2012, the Honorable Barbara S. Jones, sitting in Part I, granted Okean leave
to issue the subpoena.  *See* Dkt. 6.  That order also granted Okean leave to issue additional
subpoenas for the production of documents as Okean reasonably deemed appropriate and that
were consistent with the Federal Rules of Civil Procedure.  *See id.*

On May 8, 2012, Chadbourne moved to quash Okean's subpoena, on the grounds that:
(1) Okean sought documents that were located outside of the United States; (2) the documents
sought could be obtained from one or more of the parties to the Dutch litigation; and (3) Okean's
demands for documents were unduly intrusive and burdensome.  *See* Dkt. 9.

On June 6, 2012, Okean issued a second subpoena, to which Chadbourne also objected, *see* Dkt. 16.  Okean's second subpoena seeks production of all documents in Chadbourne's possession, custody, or control, or that of its agents, dating back to March 1, 2008, that are responsive to 16 additional requests.  *See* Dkt. 16 Ex. 1 at 7.  Specifically, the subpoena seeks, *inter alia*, all (1) "retainer or engagement letters or agreements" between Chadbourne and "Blakur, FLC West, Fradomna, Gold-Coast, Good Wing, Olympus, Poizanter, Salix, Smart-Holding, Templestowe, Wadan Holding, Wadan Yards, WYGAS, Yards Invest[,] Adamou, Blik, Hamberger, Jensen, Shamray, Shaposhnikov, Van Os, I. Yusufov and V. Yusufov," *id.*; (2) "[d]ocuments concerning the negotiation and drafting of, and performance under" various agreements, *id.*; (3) "[d]ocuments concerning the Extraordinary General Meeting of WYGAS" held on March 25, 2009 and December 4, 2009, *id.* at 7, 8; (4) documents concerning the appointment of Shaposhnikov to various boards, *id.* at 8; (5) documents concerning various aspects of the WYGAS bankruptcy proceedings, *id.*; and (6) "[d]ocuments  concerning the content of the email exchanges, dated March 17, 2010–April 8, 2010, that included, among others, Konstantin Konstantinov and Anna Kelina of [Chadbourne's] Moscow office," *id.* at 9.

On July 6, 2012, Okean moved to compel Chadbourne to produce documents responsive to its subpoenas.  Dkt. 24.  On July 20, 2012, Chadbourne submitted a memorandum of law in opposition.  Dkt. 29.

On July 31, 2012, this Court, sitting in Part I, heard argument.  Following that argument, in a ruling from the bench, the Court held that Okean had satisfied three of the four so-called "discretionary *Intel* factors."[1]  *See* Dkt. 35 (Transcript of July 31, 2012 conference ("7/31/12

---

[1] In *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004), the Supreme Court articulated four factors that district courts are to consider when determining whether to grant a § 1782 application: (1) whether "the person from whom discovery is sought is a participant in the

4

Tr.")) at 30–32.  However, the Court declined to resolve, without a developed record, whether the fourth, and highly significant, *Intel* factor was met—*i.e.*, whether the discovery sought was unduly intrusive or burdensome.  *Id.* at 32.

As to that factor, the Court stated that it had no doubt that the subpoenas as then drafted, which sought wide-ranging electronic materials from a law firm, were unduly intrusive and burdensome.  This was so both because of the scope of Okean's request, and because the request implicated privileged communications of multiple clients, and production of non-privileged materials would require creation of an extensive privilege log.  *See id.* at 33 ("A very, very expensive process would be necessitated . . . . There are usually multiple levels of review to assure that the log is correct and to assure that the privilege determination has been fairly made.  The expense here may be compounded because there may be foreign notions of privilege and there may also be multiple clients at issue here.").  In an attempt to reduce such burdens, the Court directed the parties to work together in good faith to narrow the areas in dispute.  *Id.*  The Court further stated that, absent concrete measures to reduce the subpoenas' intrusiveness and burden, the Court could not find the fourth *Intel* factor in favor of Okean, the § 1782 applicant. *Id.*

On September 7, 2012, the Court received a joint status letter from the parties informing the Court that both Okean and Blakur (through its court-appointed liquidator) had waived any attorney-client privilege they enjoyed with respect to Chadbourne.  Dkt. 101.  The letter also

---

foreign proceeding"; (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court . . . abroad to U.S. federal-court judicial assistance"; (3) "whether the [discovery] request conceals an attempt to circumvent proof-gathering restrictions or other policies of a foreign country or the United States"; and (4) whether the discovery requests are "unduly intrusive or burdensome."  *Id*. at 265; *accord Marubeni Am. Corp. v. LBA Y.K.*, 335 F. App'x 95, 96 (2d Cir. 2009).

informed the Court that Blakur had instructed Chadbourne to produce Blakur-related documents to Okean.  Chadbourne's other clients involved in the subject transactions, however, had not waived privilege.  *Id.*

That waiver changed the scope of the documents potentially reachable by Okean's § 1782 application.  Before the waiver, Okean's subpoena to Chadbourne stood (barring a basis to override attorney-client privilege) to yield only non-privileged documents in the law firm's possession, *e.g.*, documents reflecting the provision by Chadbourne personnel of business, rather than legal, services and advice to its clients.  With Okean's and Blakur's waivers, however, a much larger set of responsive materials held by Chadbourne now appeared, at least potentially, available to Okean.  That is because the universe of responsive materials had broadened now to include, in addition to non-privileged materials, privileged materials as to which the privilege holder—Okean or Blakur—was Chadbourne's client.

On September 14, 2012, the Court held a second conference.  A goal of the conference was to find whether there was a practical way to identify, within the large number of documents held electronically by Chadbourne, those responsive materials that were either non-privileged or as to which Okean and/or Blakur were the sole privilege holder(s).  Dkt. 38 (Transcript of September 14, 2012 conference ("9/4/12 Tr.")).

At the conference, the Court directed Chadbourne to take steps, including imaging of hard drives and collection of documents, to "discern the universe of . . . potentially relevant documents."  *Id.* at 25.  In its colloquy with counsel for Chadbourne, the Court also explored narrowing, for purposes of testing the burden imposed on Chadbourne as a non-party, the period of relevant electronic communications to a four- or eight-week period in early 2012.  *Id.* at 17. Significantly, Chadbourne's counsel stated that the firm had identified six of its personnel in its

Russian or Ukrainian offices as having dealt with Okean and Blakur.  *Id.* at 20.  But, counsel

stated, these personnel had dealt with Okean and Blakur as part of a group of at least seven

related corporate entities, and, in its electronic communications with those entities, Chadbourne

had not left a record as to which entity or entities it had been representing in connection with

these communications.  Further, Chadbourne represented, with respect to many (if not all) of

such written communications, it was likely that the firm was then representing multiple (or even

all) of these seven entities.

　　　This disclosure complicated the process of identifying the documents that could be

produced to Okean and Blakur based on their waivers of privilege.  Because Chadbourne's

clients other than Okean and Blakur had not waived privilege, those entities had an extant claim

of privilege as to the firm's written communications relating to them.  This prevented such

materials from being used in the Dutch civil litigation, because Okean's and Blakur's waivers of

their privilege would not vitiate these separate entities' claims of privilege.

　　　The Court therefore directed Chadbourne, at its own expense, to examine Chadbourne's

responsive electronic communications closely, for the purpose of determining whether there was

a means of determining, as to particular documents, which of the law firm's seven clients had

been the privilege holder.  *Id.* at 31–32.  The Court imposed this expense solely on Chadbourne

in recognition that this need resulted from the firm's regrettable failure to record explicitly which

of the seven client relationships were implicated by its various written communications.  *Id.* at

32–33.

　　　By letter dated January 18, 2013, Chadbourne confirmed to the Court that, although

Okean and Blakur had waived privilege, the other five corporate affiliates had not done so.  Dkt.

58 Ex. 1.  Further, Chadbourne reported, these non-waiving entities had indeed been involved in

many, if not all, communications responsive to Okean's subpoena.  *Id.* at 1, 2.  Therefore,

Chadbourne stated, it "would need to conduct a document-by-document review of all potentially

responsive documents to determine whether the purported waivers of privilege by Okean B.V.

and Blakur apply to each such document."  *Id.* at 8, 9.  Okean responded by letter dated January

28, 2013.

On February 15, 2013, in response to those letters, the Court held a conference with the

parties.  *See* Dkt. 44 (Transcript of February 15, 2013 conference ("2/15/13 Tr.")).  The Court

focused on Chadbourne's asserted inability to isolate any documents in its possession as to which

Okean or Blakur had uniquely been the firm's client.  *See id.* at 6 ("[T]he people who wrote these

documents fell far short of U.S. standards of punctiliousness in marking the record as to whose

communication it was.").  To the extent there were communications as to which Chadbourne

acknowledged that Okean or Blakur had been or appeared to be among its clients, the Court

stated, it was inclined to order that such communications be produced to Okean's counsel, on the

theory that Okean and Blakur had waived privilege.  *Id.* at 18.  Okean, the Court noted, was

entitled at least to review its privileged communications with its former counsel, Chadbourne.

However, the Court recognized, because Chadbourne had represented as to these documents that

a different (and non-waiving) client was also a privilege holder, counsel for Okean could not *use*

the documents in the Dutch litigation.  *Id.* at 19.  In other words, the Court stated, on the facts

proffered by Chadbourne, there appeared to have been a common representation by Chadbourne

of multiple clients in connection with the transactions at issue, and the later waiver of privilege

by some of these entities (Okean and Blakur) could not waive the privilege as to common

attorney-client communications enjoyed by the other five Chadbourne clients with whom Okean

and Blakur had then held a common interest.  *Id.*  Therefore, Okean and Blakur could review

these records because they were privilege holders as to them, but they could not use or expose these documents in foreign litigation, because doing so would breach the privilege of Chadbourne's other clients.  *See id.*

At the conference, Chadbourne revealed a new complicating fact:  Although Chadbourne inferred that Okean and Blakur had been among the clients covered by various of its lawyers' communications, the firm had been unable to identify *any* document as to which Okean or Blakur had explicitly been so.  *Id.* at 6.  In other words, it appeared, the Chadbourne lawyers from Russia and Ukraine who been parties to the relevant communications, had, almost across-the-board, failed to specify in their written communications the client(s) for whom they were acting.  *Id.* at 8–10.  Chadbourne had inferred from context that all seven of its clients (including Okean and Blakur) had been privilege holders as to the various communications, but, without close review of particular documents, it could not be certain of this.  *Id.* at 10.

Under these circumstances, where Chadbourne's record-keeping had prevented it from isolating the documents (if any) as to which Okean and Blakur uniquely held the privilege, the Court held that it was appropriate for Chadbourne, at its own expense, to do additional work to help sort out the issue.  Specifically, following the February 15, 2013, conference, the Court directed Chadbourne to produce (1) a privilege log, covering 1,000 documents selected according to a search-term-based proposal by Okean, and (2) declarations from client representatives and/or Chadbourne attorneys, attesting to which entities the firm had represented in which contexts.  Dkt. 43.  The Court recognized at the time that this project would impose substantial costs on Chadbourne, magnified because the responsive documents overwhelmingly were in Russian and required translation.  However, the Court held, doing so was necessary and appropriate to enable the Court to reliably resolve the § 1782 application.  2/15/13 Tr. 25–29.

On April 5, 2013, the Court received a joint letter from the parties stating that they disagreed as to whether the material produced by Chadbourne complied with the Court's February 15, 2013 order.  Dkt. 47.  The privilege log that Chadbourne had produced to Okean was subject to substantial redactions and limitations, based on Chadbourne's assertion that the confidentiality and personal data privacy laws of Russia and Ukraine imposed substantial restrictions on their production capabilities.  *Id.* at 1, 2.  The parties proposed that, to break the impasse, the Court rule on the issues of foreign law upon which Chadbourne was relying.  *Id*.

The Court agreed to do so.  On April 19, 2013, the Court entered an order directing counsel to brief: whether (1) the foreign laws upon which Chadbourne had relied are applicable in this § 1782 proceeding; (2) assuming that the foreign laws are applicable, those laws operate to prohibit Chadbourne's production of documents or information in response to the subpoenas; and (3) assuming that the laws operate to prohibit Chadbourne's production of documents or information in response to the subpoenas, the Court should nonetheless order Chadbourne to produce documents or information in response to the subpoenas.  Dkt. 49.  The parties submitted such briefs.  Dkt. 53, 54, 61.

On July 16, 2013, the Court issued a lengthy decision from the bench, resolving the questions of foreign law identified in its April 19, 2013 order.  *See* Dkt. 63 (Transcript of July 16, 2013 conference ("7/16/13 Tr.")).  The Court held that the Russian and Ukrainian laws relied on by Chadbourne do in fact apply to the § 1782 application, and do prohibit the dissemination of the subject records.  *Id.* at 10.  Thus, disclosure of these records would significantly burden and injure Chadbourne (and its non-waiving clients) were the firm compelled to comply with Okean's subpoena.  *Id.*  The Court explained that

> these laws reinforce the prohibition that U.S. law already imposes as to the production of privileged materials of nonwaiving parties, and compliance with

> Russian confidentiality law enlarges the burden on Chadbourne in scrutinizing and redacting productions of producible materials, for example, ones as to which a privilege holder has waived privilege to assure compliance with such law. However, it is also clear to the Court that Chadbourne's failure to maintain adequate records, specifically its failure to tag and segregate records reflecting the particular clients its personnel were representing in connection with the communications responsive to Okean's subpoena, has also materially contributed to the cost and difficulties Chadbourne has experienced in complying with the subpoena. To the extent the burdens on Chadbourne are of its own making, those burdens are not a persuasive basis under Section 1782 to quash the subpoena.

*Id.* at 10–11.

The Court concluded that some limited review by Okean's counsel of documents relating to the entities that had waived privilege, *i.e.*, Okean and Blakur, was warranted, because this would assist the Court in determining whether any further document review and production was merited. For example, upon review, Okean's counsel might conclude, contrary to Chadbourne's assertion, that the documents were non-privileged or no longer privileged. The Court directed Chadbourne to make available to Okean's counsel, for review on an attorneys'-eyes-only basis, the documents it had identified as relating to Chadbourne's representation of (among others) Okean and/or Blakur. *Id.* at 21–23; *see also* Dkt. 62. On July 29, 2013, Okean sought reconsideration of its July 16, 2013 order. Dkt. 65. On September 4, 2013, the Court issued an order denying reconsideration. Dkt. 70.

Chadbourne thereafter made available to Okean's counsel for review, on this limited basis, more than 600 responsive documents. Okean's counsel reviewed these documents at Chadbourne's offices. *See id.* at 6; *see also* Dkt. 89 at 1, 12.

On November 15, 2013, following this review, the parties submitted a joint letter outlining proposed next steps in the litigation. Dkt. 73. In that letter, Okean requested that the Court permit briefing on three issues: (1) whether further document production is justified following Okean's attorneys'-eyes-only review of the documents produced by Chadbourne;

11

(2) the scope of the attorney-client privilege waiver; and (3) whether the crime-fraud exception applies so as to vitiate Chadbourne's claim of privilege. *Id.* at 1. Chadbourne opposed Okean's request to address the second and third issues. *Id.* at 4. On November 20, 2013, the Court invited briefing on all three issues. *Id.* at 5.

On February 25, 2014, Okean submitted its brief. Dkt. 86 ("Okean Br."). On April 25, 2014, Chadbourne submitted its response brief. Dkt. 89 ("Chadbourne Br."). On May 9, 2014, Okean submitted a reply brief. Dkt. 90 ("Okean Reply Br.").

On June 25, 2014, the Court heard argument. Argument focused on whether the documents in question were probative of Okean's claims in the Dutch litigation; the Court had previously noted that under the fourth *Intel* factor, it was to consider whether the burdens imposed by the subpoena on its subject, Chadbourne, were undue. The parties differed as to that point, with Okean's counsel casting the documents as probative and Chadbourne's counsel asserting that they were not. To resolve this issue, and the broader § 1782 application, the Court directed counsel for Chadbourne to submit to the Court the documents cited in Okean's brief for *in camera* review by the Court. *See* Dkt. 92. The Court has subsequently received and closely reviewed these documents.

## II.    Applicable Legal Standard

Section 1782 authorizes district courts to order discovery from third parties in the United States for use in foreign proceedings. *See* 28 U.S.C. § 1782. "Pursuant to § 1782, a district court is authorized to assist a foreign or international tribunal or a litigant before such a tribunal by ordering discovery where (1) the person from whom discovery is sought resides or is found in the district; (2) the discovery is for use in a proceeding before a foreign tribunal; and (3) the application is made by a foreign or international tribunal or any interested person." *In re*

*Application of Microsoft Corp.*, 428 F. Supp. 2d. 188, 192 (S.D.N.Y. 2006) (internal quotation marks and citation omitted).  Once these statutory requirements are satisfied, district courts have "broad discretion over the issuance of discovery orders pursuant to § 1782[.]"  *In re Edelman*, 295 F.3d 171, 181 (2d Cir. 2002); *see also Intel*, 542 U.S. at 247 (satisfaction of the § 1782 factors "authorizes, but does not require, a federal district court to provide judicial assistance to foreign or international tribunals or to 'interested person[s]' in proceedings abroad" (alteration in *Intel*)); *Marubeni*, 335 F. App'x at 96 ("Once the statutory requirements are met, a district court is free to grant discovery in its discretion[.]") (internal quotation marks and citation omitted).

The Supreme Court in *Intel* articulated four factors to guide district courts in exercising this discretion:

    (1) Whether the documents or testimony sought are within the foreign tribunal's jurisdictional reach, and thus accessible absent § 1782 aid;

    (2) The nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance;

    (3) Whether the § 1782 request conceals a[n] attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States; and

    (4) Whether the subpoena contains unduly intrusive or burdensome requests.

*In re App. of OOO Promnefstroy*, No. 19 Misc. 99 (RJS), 2009 WL 3335608, at *5 (S.D.N.Y. Oct. 15, 2009) (quoting *In re Microsoft Corp.*, 428 F. Supp. 2d at 192–93; citing *Intel*, 542 U.S. at 264).  This discretion, moreover, "must be exercised in light of the twin aims of the statute: providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts."  *Id.* at *4 (internal quotation marks and citations omitted).

### III.   Discussion

The Court has already ruled that the statutory prerequisites of § 1782 have been met, and that the first three discretionary *Intel* factors would permit further document production.  *See* 7/31/12 Tr. 28–32.  Resolution of the § 1782 application, therefore, turns on the fourth and final factor—whether the discovery sought is unduly intrusive or burdensome.

Over the past two years, the Court has endeavored to test carefully and concretely what these burdens are.  The litigation aimed at illuminating this point has explored multiple issues and has imposed substantial financial costs on the parties, particularly Chadbourne.  Most recently, the Court has carefully reviewed *in camera* the sample documents identified by the parties as responsive to the subpoena and claimed by Okean to be probative.  Based on this review, the Court holds that (1) further document production would be unduly burdensome to and would injure non-party Chadbourne and its non-waiving clients (*i.e.*, those other than Okean and Blakur), and (2) this burden is not justified by the limited probative value, if any, of these documents for Okean in the Dutch litigation.  Indeed, the Court holds, this factor weighs overwhelmingly heavily in Chadbourne's favor, and against Okean's discovery request.  The motion to quash therefore must be granted.

Most important, as the Court held in its July 16, 2013 ruling, the documents Okean seeks are privileged.  They are attorney-client communications protected under Russian and Ukrainian client confidentiality and personal data privacy laws.  *See* Dkt. 62, 63.  Although Okean and Blakur have waived their privileges with respect to these laws, the other corporate clients of Chadbourne's who are privilege holders with respect to the communications sought by Okean have not done so.  The Court pressed Chadbourne, at some length and cost, to try to determine whether there are documents as to which Okean and/or Blakur were uniquely the firm's client(s),

so as to enable production of documents as to which no third party could validly claim privilege. However, no such documents have been shown to exist. On the contrary, Chadbourne has shown that the documents that Okean has identified as probative are all ones as to which non-waiving clients of Chadbourne's have an extant claim of privilege.

Under these circumstances, production of these materials to Okean for use in the Dutch litigation would not only be burdensome; it would offend core tenets of our legal system (and those of Russia and Ukraine), which each respect a client's privileged communications with counsel. And under § 1782, "[a] person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege." 28 U.S.C. § 1782(a); *accord In re Microsoft Corp.*, 428 F. Supp. 2d at 196. "Accordingly, such documents are not discoverable under § 1782, which 'expressly shields privileged material.'" *In re Microsoft Corp.*, 428 F. Supp. 2d at 196 (quoting *Intel*, 542 U.S. at 259).

There is, furthermore, no charter for continued review of Chadbourne's documents in the hope of uncovering stray probative but unprivileged documents, *i.e.*, ones as to which only Okean and/or Blakur could claim privilege. The process of translating the relevant documents from the original Russian or Ukrainian, and reviewing them for privilege, has been expensive. A statistically significant set of more than 600 documents, responsive to search criteria selected by Okean, has been produced for Okean to review on an attorneys'-eyes-only basis. Continued review of the tens of thousands of Chadbourne documents responsive to Okean's search criteria would impose vast time and expense burdens on Chadbourne. Indeed, Chadbourne represents that preparing a privilege log as to just 1,000 documents required it to expend at least $312,000 of attorney and staff time, plus more than $32,000 in costs, and that redacting 612 of those documents for attorneys'-eyes-only review in response to this Court's order imposed an

15

additional cost measured in $320,500 in attorney time, plus more than $32,200 in costs. Chadbourne Br. 12; *see also* Dkt. 58.  And there is no reason to assume that review of later waves of Chadbourne's responsive documents would uncover documents not subject to a claim of privilege by the firm's other clients.  Tellingly, Okean does not make any such claim.

Instead, Okean makes a different argument.  It asserts that the documents in question ought not be treated as privileged, because they fall within the crime-fraud exception to the attorney-client privilege.  Okean posits that Chadbourne's communications with its clients were part of a knowing scheme to loot Okean—specifically, to transfer Okean's shares in Ukrainian shipyard Wadan Yards to Blakur, a "dummy" corporation, for little consideration, and immediately thereafter to force Okean's parent company into bankruptcy, in an effort to loot the bankruptcy estate.  *See* Okean Br. 2.  Thus, Okean contends, the documents it seeks reflect communications in furtherance of a fraudulent conveyance, and any privilege applicable to these documents is nullified.  *Id.*; *see generally United States v. Jacobs*, 117 F.3d 82, 87 (2d Cir. 1997), *abrogated on other grounds by Loughrin v. United States*, 134 S. Ct. 2384 (2014); *In re John Doe, Inc.*, 13 F.3d 633, 636 (2d Cir.1994); In *re Grand Jury Subpoena Duces Tecum Dated September 15, 1983*, 731 F.2d 1032, 1038 (2d Cir. 1984).

For two independent reasons, the Court rejects this bid.

First, Okean has not claimed that an analog to the American crime-fraud exception actually exists so as to limit the reach of the Russian and Ukrainian confidentiality and privacy laws that the Court has held are implicated here.  Okean did not, for example, submit a declaration to this effect from an expert on such laws.  Chadbourne, by contrast, put forward the declaration of a knowledgeable expert to establish the existence of the relevant Russian and Ukrainian laws and their application to this case.  *See* Dkt. 57.  Instead, Okean asks the Court, on

16

its own authority, to treat these laws as coextensive with U.S. privilege law, *i.e.*, to exempt from

protection those communications shown to have been in furtherance of ongoing or contemplated

crime or fraudulent activity.  Okean argues that a U.S. court that failed to treat a foreign privilege

law as subject to such a crime-fraud exception would contravene the public policy of this

country.  *See* Transcript of June 25, 2014 Oral Argument ("6/25/13 Tr.") 6 (MR. CUTLER:

"[W]e are not claiming that there is a . . . crime fraud exception[.] . . . However, we have made

the claim that . . . you take a look at the foreign law and then you determine whether there's . . .

any public policy that would abnegate the foreign law."); *id.* at 8 (THE COURT: "[Y]ou are not

claiming that there's an exception under [Russian] law where the documents are demonstrated to

be in the service of a crime or fraud?"  MR. CUTLER: "We are not claiming that, your Honor.").

The Court is unpersuaded that this asserted public policy rationale justifies ordering, in

the context of a § 1782 proceeding, the production of documents that Russian and Ukrainian law

protect from production.  Significantly, Okean has not claimed that the alleged fraud at issue

here implicated domestic interests or violated U.S. law.  The violations of law that it alleges were

wholly extraterritorial.  There is, thus, no distinctly American interest served by treating the

Russian and Ukrainian data protection and confidentiality laws as if they were subject to a U.S.-

style crime-fraud exception.  And grafting this American legal concept onto these foreign laws

would "frustrate rather promote the twin aims of § 1782: providing efficient means of assistance

to participants in international litigation in our federal courts and encouraging foreign countries

by example to provide similar means of assistance to our courts."  *In re App. of OOO*

*Promnefstroy*, 2009 WL 3335608, at *10 (internal quotation marks and citations omitted).

Indeed, doing so would incent litigants to end-run their own civil-litigation systems to

pursue, in U.S. courts, discovery to which they would not have access in their home tribunals.

That is, in fact, already a significant concern in this case.  At the June 25, 2014 conference, the Court inquired as to the status of the Dutch lawsuit and the state of discovery.  Okean's counsel informed the Court that—even though two years have passed since its § 1782 application— literally no discovery has been obtained in that case and the case has not moved appreciably forward.  6/25/14 Tr. 11–16.  It therefore appears that Okean is seeking to build its case dominantly on the privileged materials it hopes to obtain from Chadbourne, materials to which it would not be entitled under Dutch discovery protocols.

Under these circumstances, the Court is particularly loathe to subvert foreign laws limiting discovery (here, the Russian and Ukrainian confidentiality and data privacy limitations) by reconceiving them to include a crime-fraud limitation.  Far from encouraging foreign countries "by example" to provide similar assistance to our courts, ordering discovery under these circumstances would offend the considered laws of these nations.  *See In re App. of OOO Promnefstroy*, 2009 WL 3335608, at *10 ("[O]rdering the discovery would not 'encourage foreign countries by example,' unless that example is to aid litigants in circumventing the judicial systems of foreign countries.  Therefore, the Court finds that granting [the] applications would not promote the twin aims of § 1782.").

Second, even if there were a U.S.-style crime-fraud exception to the foreign laws that otherwise bar production of Chadbourne's privileged documents, the documents the Court has reviewed *in camera* do not establish, as a factual matter, that that exception applies here.  Under U.S. law, "communications that otherwise would be protected by the attorney-client privilege or the attorney work product privilege are not protected if they relate to client communications in furtherance of contemplated or ongoing criminal or fraudulent conduct."  *In re Grand Jury Subpoena*, 731 F.2d at 1038 (collecting cases).  "Such communications are properly excluded

18

from the scope of the privilege even if the attorney is unaware that his advice is sought in furtherance of such an improper purpose." *Id.* However, "[a] party wishing to invoke the crime-fraud exception must demonstrate that there is a factual basis for a showing of probable cause to believe that a fraud or crime has been committed and that the communications in question were in furtherance of the fraud or crime." *Jacobs*, 117 F.3d at 87. The probable cause determination requires "a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud, and that the communications were in furtherance thereof," *In re John Doe, Inc.*, 13 F.3d at 636, but "the fraudulent nature of the objective need not be established definitively," *In re Grand Jury Subpoena*, 731 F.2d at 1039.

Here, Okean contends that the documents produced to it for attorneys'-eyes-only review reveal that Chadbourne's communications with its clients were "in furtherance of planning and carrying out [a] fraudulent conveyance." Okean Br. 6. Specifically, Okean posits, the documents confirm a conveyance, for inadequate consideration, of Okean's shares in Wadan Yards to Blakur prior to the declaration of bankruptcy by Wadan Yards Group AS. *See id.* at 2 ("The documents reviewed . . . demonstrate the inner workings of an elaborate scheme to transfer Okean's valuable assets prior to the declaration of Wadan Yards Group AS's ('WYGAS') bankruptcy."); *see also id.* at 24–25 ("The email communications reviewed . . . detail the motivation for the fraudulent conveyance, the effort to replace the Okean Board of Directors, the replacement of the Board with a friendly Board member with sole authority to act for Okean, the development step by step of the strategy to convey Okean's assets and the documents used to effectuate the fraudulent conveyance and the involvement of Blakur in the fraudulent conveyance.").

As a threshold matter, Okean has not set out for the Court the elements of fraudulent conveyance under Russian and Ukrainian law (or, for that matter, cited authority even to confirm that the law of these lands forbids such conveyances).  Okean simply asks the Court to assume that these laws each prohibit fraudulent conveyances to the extent that the law of this forum (New York) does.  This assumption is, of course, far from obvious.

But even accepting Okean's premise, the facts do not establish the requisite elements. Under New York law, "[e]very conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors."  N.Y. Debt. & Cred. Law § 276.  The burden of proving fraudulent intent "is on the party seeking to set aside the conveyance," and must be established "by clear and convincing evidence."  *United States v. McCombs*, 30 F.3d 310, 328 (2d. Cir. 1994).  For the purposes of a fraudulent conveyance claim, fraudulent intent may "be established by inference from the circumstances surrounding the allegedly fraudulent act."  *Amusement Indus., Inc. v. Midland Ave. Assocs., LLC*, 820 F. Supp. 2d 510, 530 (S.D.N.Y. 2011) (internal quotation marks and citations omitted).  This inference can be drawn from so-called "badges of fraud," including "(1) a close relationship between the parties to the transaction, (2) a secret and hasty transfer not in the usual course of business, (3) inadequacy of consideration, (4) the transferor's knowledge of the creditor's claim and his or her inability to pay it, (5) the use of dummies or fictitious parties, and (6) retention of control of the property by the transferor after the conveyance."  *Id.* (internal quotation marks and citations omitted).

The Court has closely reviewed the electronic communications that Okean contends reveal a fraudulent conveyance scheme.  Because these documents are privileged and were

reviewed *in camera*, the Court elects not to quote from them, lest the privilege enjoyed by Chadbourne's clients be thereby breached.  It suffices to say that Okean would infer a fraudulent conveyance from a series of facts reflected (or assertedly reflected) in the documents, to wit: (1) the replacement of Okean board members with a board member allied with Blakur; (2) the manner in which Blakur was created; (3) the arrangement for an immediate transfer of Okean's shares in Wadan Yards; and (4) the alleged backdating of documents to obscure the time that certain transactions were effectuated.  *See* Okean Br. 7–20.  Okean argues that these documents reveal that the transactions were made hastily, not at arms' length, and for inadequate consideration, bespeaking, it claims, a fraudulent conveyance.  *Id.*

Having reviewed those documents carefully *in camera*, the Court rejects this claim. Simply put, the documents fall far, far short of establishing the crime-fraud exception.  They do not reveal a fraudulent scheme, or anything close.  They reflect attorneys working with clients to arrange a complex business transaction on a tight timetable.  To be sure, if one starts off with the premise, as Okean does, that there was a fraudulent scheme afoot, the documents contain stray turns of phrase or factual particulars that can be woven into a broader tale of fraud.  But if one starts off with the correct assumption, which is that the burden of proving the crime-fraud exception  is on the entity seeking to defeat privilege, the documents are manifestly insufficient to show any such fraud.  Therefore, the Court holds, emphatically, that the documents in question remain privileged, even if a U.S.-style crime-fraud exception could be said to exist.

Under these circumstances, the burden and intrusiveness of compelling production of these documents would be substantial.  As Chadbourne has persuasively shown, its production of such materials, in violation of the foreign advocate secrecy and data privacy laws, could expose

its lawyers to sanctions.[2]  *See* Chadbourne Br. 13 ("Chadbourne's production of any documents or information in response to the Subpoenas would violate the Law on Advocates," and thus would expose "[the firm's lead partner on the engagement] and other Chadbourne employees to . . . disciplinary sanctions[.]").

The Court therefore, after considered review, denies Okean's § 1782 application.  The Court bases this ruling on its determination that production of Chadbourne's documents would be unduly intrusive and burdensome, both to Chadbourne's clients other than Okean and Blakur, as to which clients these documents are privileged, and to Chadbourne and its counsel, who would face potential sanctions for breaching the foreign laws preventing their disclosure.  *See In re Microsoft Corp.*, 428 F. Supp. 2d. at 196 (denying § 1782 application in part because the discovery request was "unduly intrusive and burdensome in that it seeks documents that may be protected as confidential by the [European] Commission's rules on access to file and that are privileged under U.S. law").  And translation, review, and production of these materials would impose other burdens on Chadbourne, both in terms of time and money.  The probative value of the materials at issue, which the Court judges to be conjectural at best, does not come close to justifying imposing any, let alone all, of these burdens.  "[Okean]'s application thus bears little resemblance to those cases in which such applications were routinely approved—cases requesting a single document or report, or even those documents relating to a single transaction

---

[2] For this reason, the third discretionary *Intel* factor—whether the request would circumvent proof-gathering restrictions or other policies of a foreign country—has now in fact been shown, too, to favor denial of Okean's § 1782 application.  The Court originally held otherwise, based on its finding that the § 1782 application did not offend the discovery rules of the *Dutch* forum in which Okean proposed to use the documents.  However, the Court is now persuaded that production of Chadbourne's privileged materials would breach the laws of two other countries, Russia and Ukraine.  This finding reinforces and supplies an independent basis for denial of the § 1782 application.

or event." *In re App. of OOO Promnefstroy*, 2009 WL 3335608, at *9 (collecting cases).  The

burden that production of such documents would impose on non-party Chadbourne and its non-

waiving clients is so great that it easily outweighs the other *Intel* factors, and compels denial of

Okean's § 1782 application.

**CONCLUSION**

For the foregoing reasons, Okean's application to take discovery pursuant to § 1782 is

denied and Chadbourne's motion to quash Okean's subpoena is granted.  The Clerk is directed to

terminate any motions pending on the docket and to close this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: October 10, 2014
       New York, New York

23